Filed 6/16/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| PACIFIC GAS AND ELECTRIC COMPANY,<br><br>    Petitioner,<br><br>v.<br><br>PUBLIC UTILITIES COMMISSION,<br><br>    Respondent;<br><br>CITY OF SAN BRUNO et al.,<br><br>    Real Parties in Interest. | A142127<br><br>(Cal. PUC Decision Nos. 13-12-053 & 14-05-034) |

Pursuant to its statutory authority to adopt "rules of practice and procedure" (Pub. Util. Code, § 1701, subd. (a)[1]), the Public Utilities Commission (PUC or Commission) promulgated Rule 1.1, which provides in pertinent part: "Any person who . . . transacts business with the Commission . . . agrees . . . never to mislead the Commission or its staff by an artifice or false statement of fact or law." (Cal. Code Regs., tit. 20, § 1.1 (Rule 1.1).)

In the aftermath of a massive 2010 explosion of an underground gas pipeline owned and operated by Pacific Gas and Electric Company (PG&E), the PUC imposed a series of reforms to be instituted by PG&E. One of those reforms was that PG&E improve its recordkeeping and information technology capabilities. PG&E was directed to keep the PUC informed of any reported pipeline leaks and any discovered information regarding the safety of continuing pipeline operations. Thereafter, following discovery of

---

[1] Statutory references are to the Public Utilities Code unless otherwise indicated.

1

a pipeline leak, PG&E also discovered that some information it had provided to the PUC concerning the internal pressure at which certain pipelines could be safely operated might not be correct. Approximately seven months after discovery of this mistake was internally verified by PG&E, it was communicated to the PUC via a written "Errata" to a previous filing. Following extensive hearings, the PUC deemed this filing both a substantive and a procedural violation of Rule 1.1, which the Commission determined had the effect of misleading the Commission. For this dual violation of Rule 1.1, the Commission imposed civil penalties totaling $14,350,000.

We granted PG&E's petition for a writ of review to consider: (1) whether the penalties were validly imposed in the belief that Rule 1.1 does not invariably demand a scienter requirement; (2) whether the Commission correctly treated PG&E's act and omission as "continuing" violations; (3) whether the PUC's order to show cause provided sufficient notice of the grounds for which PG&E might be penalized; and (4) whether the penalties authorized by sections 2107 and 2108 are constitutionally excessive. With appropriate consideration for the unique powers of the PUC, we conclude that none of PG&E's contentions has merit. We therefore affirm the decisions of the PUC imposing the penalties and denying PG&E's request for rehearing.

## BACKGROUND

### The Nature, Duties, and Powers of the PUC

Our Supreme Court has described the PUC as "a state agency of constitutional origin with far-reaching duties, functions and powers. (Cal. Const., art. XII, §§ 1–6.) The Constitution confers broad authority on the commission to regulate utilities, including the power to fix rates, establish rules, hold various types of hearings, award reparation, and establish its own procedures. (*Id*., §§ 2, 4, 6.) The commission's powers, however, are not restricted to those expressly mentioned in the Constitution: 'The Legislature has plenary power, unlimited by the other provisions of this constitution but consistent with this article, to confer additional authority and jurisdiction upon the commission . . . .' (Cal. Const., art. XII, § 5.)

2

"Pursuant to this grant of power the Legislature enacted Public Utilities Code section 701, conferring on the commission expansive authority to '*Do all things*, whether specifically designated in [the Public Utilities Act] *or addition thereto*, which are necessary and convenient' in the supervision and regulation of every public utility in California. (Italics added.) The commission's authority has been liberally construed." (*Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891, 905.) That authority amounts to "comprehensive jurisdiction over questions of public health and safety arising from utility operations," and "includes not only administrative but also legislative and judicial powers." (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 915, 924.)

The Legislature has also provided the PUC with extensive enforcement powers, including the imposition of monetary civil penalties: "Any public utility that violates or fails to comply with any provision of the Constitution of this state or of this part, or that fails or neglects to comply with any part or provision of any order, decision, decree, rule, direction, demand, or requirement of the commission, in a case in which a penalty has not otherwise been provided, is subject to a penalty of not less than five hundred dollars ($500), nor more than fifty thousand dollars ($50,000) for each offense." (§ 2107.) "In determining the amount of such penalty, . . . the appropriateness of such penalty to the size of the business charged, the gravity of the violation, and the good faith of the person charged . . . shall be considered." (§ 2104.5.) "Every violation . . . is a separate and distinct offense, and in case of a continuing violation each day's continuance thereof shall be a separate and distinct offense." (§ 2108.)

Among the Commission's duties is administering the regulatory authority over the intrastate "production, generation, transmission, delivery, underground storage, or furnishing of gas, natural or manufactured, except propane, for light, heat, or power." (§ 221; see also §§ 216, 222, 328.2, 2771–2775.6.) It is also authorized to exercise a measure of federal interstate power under the Pipeline Safety Act. (49 U.S.C. §§ 60104(c), 60105(b)(2), 60106(b); *Olympic Pipe Line Co. v. City of Seattle* (9th Cir. 2006) 437 F.3d 872, 878 ["a state authority may enter into a pipeline safety agreement

with the DOT [Department of Transportation], through which the DOT authorizes the state authority to participate in the oversight of interstate pipeline facilities"].) "The Commission in this capacity applies the federal pipeline safety regulations contained in 49 Code of Federal Regulations (CFR) Part 192, *et seq.* The Commission adopted General Order (GO) 112-C in 1971, which adopted in their entirety the federal pipeline safety rules in 49 C.F.R Part 192, also adopted in 1971." (Cal.P.U.C. Order 12-01-007 (Jan. 12, 2012) [Slip Opn., p. 7].)

### The San Bruno Pipeline Explosion

This proceeding traces back to what is commonly known as the San Bruno pipeline explosion, the salient details of which were described in a PUC report as follows:

"On September 9, 2010, at approximately 6:11 pm, a 30-inch diameter natural gas transmission pipeline owned and operated by PG&E ruptured in San Bruno, California. Gas escaping from the rupture ignited resulting in the loss of eight lives, injuries to 58 people, destruction of 38 homes, moderate to severe damage to 17 homes and minor damage to 53 homes.

"The section of pipeline involved was Segment 180, . . . located at the intersection of Earl Avenue and Glenview Drive . . . [¶] . . . [¶] Energy released from the rupture created a crater about 72 feet long by 26 feet wide. A 28-foot long section of pipe weighing approximately 3,000 pounds was ejected from the crater and landed approximately 100 feet from the crater in the middle of Glenview Drive."

"During the 50 hours following the incident, about 600 firefighting (including emergency medical service) personnel and 325 law enforcement personnel responded. Fire crews and police officers conducted evacuations and door-to-door searches of houses throughout the response. In total, about 300 homes were evacuated." (Incident Investigation Report September 9, 2010 PG&E Pipeline Rupture in San Bruno, California (Cal.P.U.C., Jan. 12, 2012) (Investigation Report) [Slip Opn., pp. 7–8, 13].) "The rupture released about 47.6 million standard cubic feet of natural gas." (Cal.P.U.C. Decision 11-02-016 (Feb. 24, 2011) [Slip Opn., p. 3].)

4

At the time of the explosion, the pipeline had been authorized to maintain a maximum allowable operating pressure (MAOP) of 400 psig, but it had an effective MAOP of 375 psig.[2] (Investigation Report, *supra* [Slip Opn., pp. 7, 22].) Four days after the explosion, the Commission's Executive Director directed PG&E to reduce the operating pressure of the affected pipeline by 20 percent "until such time as the Commission allows PG&E to return to . . . normal operating pressure," and also to "Conduct an accelerated leak survey of all transmission lines in PG&E's service territory . . . and take corrective action as required and report the results . . . on or before October 12, 2010." (Cal.P.U.C. Res. No. L-403 (Sept. 23, 2010) [Slip Opn., p. 3].) And the PUC issued a press release that it would direct PG&E to "Report immediately . . . and provide specific data on all leak reports." (Cal. Pub. Util. Com., Press Release, CPUC Orders PG&E to Take Specific Action Related to San Bruno Explosion, Including Inspection of Natural Gas System (Sept. 12, 2010) <http://docs.cpuc.ca.gov/PUBLISHED/NEWS_RELEASE/123315.htm> [as of June 14, 2015].)

## The PUC Begins to Investigate

Two weeks after the explosion, on September 23, 2010, the Commission ordered an investigation into the causes of "the San Bruno explosion," which "may be the largest transmission pipeline explosion in an urban/suburban setting in U.S. history, certainly the most catastrophic in California history."[3] (Cal.P.U.C. Res. No. L-403, *supra* [Slip Opn., p. 2].) The Commission adopted certain "mandates" to PG&E ordered by the Commission's Executive Director, thus ratifying the 20 percent reduction of pipeline operating pressure, and reiterating that PG&E had to, among other things: "7) Preserve all records related to the incident, including work at the Milpitas Terminal during the

___

[2] PG&E advises that the second abbreviation stands for "pounds per square inch gauge, indicating pressure relative to atmospheric pressure." The methods for calculating the MAOP for natural gas pipeline transmission can be found at 49 C.F.R. §§ 192.619–192.620 (2008).

[3] A federal investigation had already been commenced by the National Transportation Safety Board (NTSB).

month of September 2010; [¶] 8) Preserve all records related to the maintenance or modification of Line 132 by PG&E and/or its contractors performed within the City of San Bruno over the past ten (10) years; [and] [¶] 9) Review the classification of natural gas transmission lines and determine if the classification has changed since the initial designation and report the results to the Executive Director." (*Id.* [Slip Opn., pp. 3–4].)

After conducting an extensive investigation into the pipeline explosion, the Commission's Consumer Protection and Safety Division concluded: "[T]he San Bruno incident was caused by a combination of multiple contributing factors: [¶] 1. PG&E's failure to follow accepted industry practices when it constructed Segment 180 in 1956; [¶] 2. PG&E's failure to comply with the integrity management requirements; [¶] 3. PG&E's inadequate record keeping practices; [¶] 4. Deficiencies in PG&E's SCADA system and inadequate procedures related to the work at the Milpitas Terminal[4] and PG&E's failure to comply with its own procedures; [¶] 5. PG&E's deficient emergency response after the incident; and [¶] 6. PG&E's corporate culture emphasizing profits over safety." (Investigation Report, *supra* [Slip Opn., p. 3].) Some of the supporting details were as follows:

---

[4] "SCADA" is an acronym for Supervisory Control And Data Acquisition. It is described in the PUC investigation report as "the use of computers and communications networks to gather field data from numerous remote locations, perform numerical analysis, and generate trends and summary reports. . . . SCADA systems make it possible to control a process that is distributed over a large area with a small group of people located in a single room." PG&E's SCDA system was called "one of the largest in the U.S., providing remote control of 6,438 miles of transmission pipeline." (Investigation Report, *supra* [Slip Opn., pp. 70–71].)

The Milpitas Terminal appears to be something like a district center responsible for, among other things, administration, maintenance, and emergency response for its vicinity. It was the nearest such center and the epicenter of PG&E activity before and during the explosion. It was also a terminus for intrastate gas transmission pipelines, and the junction for routing gas north to San Francisco. (Incident Investigation, *supra* [Slip. Opn., pp. 7, 72, 74–76, 86, 95–97]; Cal.P.U.C. Order 12-01-007, *supra* [Slip Opn., p. 2.) According to the Commission: "Gas coming into Milpitas Terminal supplies the vast majority of customers along the San Francisco peninsula." (Cal.P.U.C. Decision 11-09-006 (Sept. 8, 2011) p. 1.)

6

"In 1956, when PG&E constructed the section of pipe that failed in San Bruno, it did not follow accepted good industry practice existing at the time.  PG&E's failure to identify deficiencies in pipe manufacturing through inspection and testing at the time of construction resulted in the installation of defective pipe in the ground."  "PG&E was unable to produce records demonstrating that a strength test was performed on segment 180 at the conclusion of its construction, and before the segment was placed in operation."  (Incident Investigation Report, *supra* [Slip Opn., pp. 15, 22].)

"The investigation found that PG&E did not comply with certain integrity management requirements in the federal pipeline safety regulations.  Significant deficiencies were found in data gathering and integration, threat identification, risk assessment, and assessment."  (Incident Investigation Report, *supra*, [Slip Opn., p. 25].)

"The investigation found that, at the time of the incident, PG&E transmission pipeline records were not accurate, complete, or verifiable.  PG&E's records showed inaccurate information of Segment 180 . . . and PG&E could not identify the manufacturer of Segment 180 or locate its as-built drawings, alignment sheets, specifications and other design, material, construction, inspection, and testing records. . . . [¶] PG&E failed to follow the record keeping standards . . . which were applicable at the time Segment 180 was constructed and, in turn, violated the Public Utilities Code, Section 451 by operating its system unsafely by lacking accurate and locatable records essential for safe pipeline operation."  "PG&E's transfer of data from hard copies to electronic format was not performed adequately.  Some data was not transferred accurately or was completely missed due to human error or varying software versions and file format incompatibilities."  (Incident Investigation Report, *supra* [Slip Opn., pp. 62, 64].)

In February 2011, the PUC, noting that the NTSB had already publicly expressed "concern about the safety implications of the PG&E record-keeping deficiencies the NTSB [had] uncovered in the San Bruno investigation," decided to commence an expansive investigation of PG&E's recordkeeping practices, not limited to the immediate

7

time before the explosion—indeed, not limited to the San Bruno pipeline.[5] (Cal.P.U.C, Order 11-02-016 (Feb. 24, 2011) [Slip Opn. p. 7].) PG&E was warned that "The Commission is prepared to impose very significant fines [and 'statutory penalties pursuant to Section 2107'] if the evidence adduced at the hearing establishes that PG&E's recordkeeping policies and practices contributed to the loss of life and injuries that occurred at San Bruno." (*Id*. [Slip Opn., pp. 11–12].) "PG&E is therefore directed to . . . provide a report . . . to identify all reasons of law and fact currently known to PG&E to establish that the company has committed no violation of law with respect to its recordkeeping of data needed and appropriate for safety engineering." (*Id*., [Slip Opn., pp. 16, 20].)

---

[5] The investigation was described as follows: "The Commission will investigate and decide whether PG&E's recordkeeping pertaining to the gas transmission lines, *including San Bruno*, has violated good and accepted engineering standards and practices, and thus whether PG&E violated Section 451of the Public Utilities Code or other laws and regulations. [¶] . . . [¶] In this investigation, the Commission intends to ascertain the adequacy of PG&E's recordkeeping *for the entire life of the San Bruno pipeline* that ruptured on September 9, 2010, under both state and federal standards and law that the Commission is specifically empowered to enforce. We also intend to ascertain recordkeeping adequacy for *all* PG&E gas transmission pipelines. [¶] . . . [¶] We consider this quite a broad subject . . . because we will review evidence to determine whether deficient recordkeeping may adversely affect and reduce safety in design, construction, operations, testing, maintenance, inspection, risk assessment, and pipe replacement." (Cal.P.U.C, Decision 11-02-016 (Feb. 24, 2011) [Slip Opn., pp. 8–10], italics added.)

The explosion also produced a flurry of responsive activity from the Legislature. (See Stats. 2011, chs. 519 [adding §§ 956.5, 957, 958.5, 959. 969, requiring every gas corporation to meet annually with local fire departments, install automatic shutoff valves, to "prepare and submit to the commission a proposed comprehensive pressure testing implementation program for all intrastate transmission lines," to file biannual "a gas transmission and storage safety report," and directing that "[a] gas corporation shall not recover any fine or penalty in any rate approved by the commission"]; 522 [adding §§ 961, 963, requiring every gas corporation to "develop a plan for the safe and reliable operation of its commission-regulated gas pipeline," get it approved by the PUC, and implement it]; 523 [adding § 969 directing the PUC to require an account "for the maintenance and repair of transmission pipelines"; and amending § 2107 to increase the maximum penalty from $20,000 to $50,000].)

8

In September 2011, the PUC denied PG&E's "motion . . . to delegate authority to the Executive Director to approve requests to lift operating pressure limitations," but "instead adopt[ed] an expedited hearing process for Commission consideration of such requests." (Cal.P.U.C. Decision 11-09-006 (Sept. 8, 2011) [Slip Opn., p. 1].) The Commission reasoned that "the process proposed by PG&E is inadequate to discharge our Constitutional and statutory duties. The public interest in PG&E's natural gas operations is intense. Restoring MAOP in PG&E's transmission pipelines has significant implications for public safety. The public deserves to be informed about PG&E's proposed MAOP restoration and to have an opportunity to assess PG&E's evidence in support of the request. Moreover, PG&E's proposed delegation, particularly in light of the unspecified supporting analysis, goes well beyond the scope of ministerial matters for which the Commission may properly delegate its authority. The Commission ordered the operating pressure reductions . . . and the Commission should consider whether these ordered reductions should be lifted." (*Id*. at p. 7].) And, PG&E was cautioned, it "must be fully accountable for the pressure test and the assertion that the line can be safely operated at the restored MAOP." (*Id*. at p. 11.)

In December 2011, after PG&E had conducted the pressure test, the PUC authorized PG&E "to operate Lines 101, 132A, and 147 at a pressure no higher than 365 pounds per square inch gauge."[6] (Cal.P.U.C. Decision 11-12-048 (Dec. 15, 2011) [Slip Opn., pp. 1, 7, 10].) Doing so, the Commission made two findings of fact that are significant:

---

[6] The decision describes Line 101 as follows: "Located along the San Francisco Peninsula, Line 101 runs 34 miles from Milpitas Terminal in Santa Clara County to the San Francisco Gas Load Center in San Francisco . . . Line 101 approximately follows the alignment of Highways 237 and 101. At the Lomita Park Meter Station, located across the freeway from the San Francisco Airport, the pressure on Line 101 is reduced as the gas supply moves toward San Francisco." Lines 132A and 147 are "cross-ties" to Line 101, measuring 1.5 and 3.8 miles in length, respectively. (Cal.P.U.C. Decision 11-12-048 (Dec. 15, 2011) [Slip Opn., pp. 1–2].)

9

"PG&E's Vice President of Gas Transmission, Maintenance, and Construction, verified that PG&E has validated the engineering and construction of, and performed pressure tests in accordance with 49 CFR 192 Subpart J or the pressure test requirements then in effect, on all segments of Lines 101, 132A, and 147 that will be operating at or above 20% of specified minimum yield strength [see fn. 2, *ante*], and concluded that these pipelines could be safely operated at the increased maximum operating pressure of 365 psig.

"CPSD [the Commission's Consumer Protection and Safety Division] reviewed PG&E's supporting information and concluded that the information presented was adequate to support the conclusion that pressure on the lines could be safely increased to 365 psig." (Cal.P.U.C. Decision 11-12-048, *supra* [Slip Opn., pp. 9–10].)

Again, PG&E was cautioned that it "must be fully accountable for . . . the assertion that the line can be safely operated at the restored [MAOP]." (Cal.P.U.C. Decision 11-12-048 , *supra* [Slip Opn., p. 6].)

Meanwhile, the previous month, November 2011, the PUC—noting that "PG&E appears to have failed to comply with federal regulations concerning the protection of persons and property in areas with higher concentrations of human occupancy and activity"—formally opened an investigation into the San Bruno explosion. (Cal.P.U.C. Investigation Order 11-11-009 (Nov. 10, 2011) [Slip. Opn., pp. 1, 5, 13.) It began on January 12, 2012, when the PUC commenced a new, separate, and wide-ranging investigation: "This investigation will not be solely limited to the events that took place on September 9, 2010, but shall include all past operations, practices, and other events or courses of conduct that could have led to or contributed to the San Bruno explosion and fire. We will specifically consider what monetary fines and other remedies are appropriate to ensure that a catastrophe of this type does not occur again." (Cal.P.U.C. Order 12-01-007 (Jan. 12, 2012) [Slip Opn., pp. 2–3].)

In its petition, PG&E provides its explanation of what happened next:

"On October 18, 2012, a PG&E employee discovered that a portion of the pipe on Line 147 appeared to be of a different specification than that described in PG&E reports.[7] Whereas the records indicated that the particular portion of the pipeline was of a type known as a 'Double Submerged Arc Weld,' the employee believed based on his visual field inspection that the pipe was instead of a type known as 'A.O. Smith.' The employee shared the apparent discrepancy with others at PG&E for further investigation and confirmation. Over the next several months, PG&E employees confirmed the Line 147 included 'A.O. Smith' pipe.

"PG&E employees determined, based on the newly-discovered specification information, that the proper MAOP of Line 147 should be 330 psig rather than 365 psig. However, . . . Line 147 was already operating at a reduced pressure of 330 psig or less, no further reduction in operating pressure was necessary . . . .

"Over the next several months, PG&E investigated how some of the Line 147 pipe had been incorrectly identified in the records, reviewed all other specifications, re-reviewed the information obtained from construction activities on the entire Line 147, performed field examinations on the pipe, performed what is known as 'destructive testing' on a portion of the pipe, and reviewed the records pertaining to the other pipelines affected by the Commission's [Decision] 11-02-048.

"Over the same period, PG&E employees found that certain federal pipeline regulations had been incorrectly applied to a portion of Line 101, another pipeline whose pressure had been restored by D.11-02-048. Whereas PG&E had previously relied on tests conducted in 1989 to determine the MAOP for that pipeline, employees concluded that under the regulations an earlier test conducted prior to 1974 should have been used for this purpose.

"PG&E employees determined, based on the change in regulatory classification, that the proper MAOP of that portion of Line 101 should be 330 psig rather than 365

---

[7] One detail PG&E does not include in this narrative is that it discovered the "specification" discrepancy only because Line 147 was being examined to halt a gas leak.

11

psig. However, . . . [as] Line 101 was already operating at a reduced pressure of 330 psig or less, no further reduction in operating pressure was necessary . . . .

"On February 22, 2013, PG&E contacted the Commission's staff to arrange a meeting or teleconference to repeat these findings. A teleconference was held on March 20, 2013, during which PG&E employees discussed with the Commission's staff the corrected information relating to Lines 101 and 147. In response to requests by Commission staff during that teleconference, on May 2 and May 8, 2013, PG&E provided the staff with validation reports and other materials concerning Lines 101 and 147, and further advised that PG&E was continuing its review of records relating to these and other lines."[8]

## PG&E Files the Errata and the PUC Response

On July 3, 2013, PG&E submitted for filing a document entitled "Errata to Pacific Gas and Electric Company's Supporting Information for Lifting Operating Pressure Restrictions on Lines 101 and 147." The document represented to the Commission that "After receiving Decision 11-02-048, PG&E identified errors in some of the supporting information for Lines 147 and 101. [¶] The errors do not raise a safety issue, as each affected segment has been successfully hydro tested to a pressure that supports the MAOP. However, after correcting these errors the affected segments will have a lower MAOP than approved in Decision11-02-048. Both segments are currently operating below the new, lower MAOP." The "Errata" concluded with this: "[T]he operating pressure of Line 101 has been limited to 300 psig since April 2013 and PG&E is revising the MAOP of this segment of Line 101 from 365 psig to 330 psig . . . . In addition to revising the MAOP of this segment, PG&E has accelerated plans to replace it. PG&E is currently planning to replace the affected portion of Line 101 in 2014–2015."

PUC staff refused to accept this document for filing. On August 19, the PUC issued an order for PG&E to show cause (OSC) why it should not be sanctioned for violating Rule 1.1. The OSC recited that the Errata was "rejected . . . as untimely to the

---

[8] Actually, PG&E spoke with only a single staff member of the PUC.

12

extent that it sought to make a substantive change to issues" previously resolved by the Commission. And under the heading "Issues Revealed in PG&E's July Document," the OSC read as follows:

"PG&E's July document raises procedural and substantive issues. Procedurally, parties are not allowed to file pleadings for the purpose of correcting minor typographical or computational errors in previously filed applications. Parties are allowed to file pleadings for the purpose of making substantive changes to a previously filed application, and such filing triggers the opportunity for other parties to file a responsive pleading (unless limited or prohibited . . . ). Here, PG&E appears to be revealing a substantial error in an application upon which the Commission has relied in issuing a decision. Attempting to correct an application eighteen months after the Commission issued a decision appears to be an unreasonable procedural choice and could be interpreted as attempting to create an inaccurate impression of a routine correction. The timing of the attempted filing, the day before a summer holiday weekend, also raise questions.

"Substantively, as the record shown in this proceeding and others, the accuracy of PG&E's natural gas transmission pipeline records has been and remains an extraordinarily controversial issue in which the public has an intense interest. The facts stated in PG&E's July filing appear to directly implicate this issue, particularly the continuing inaccuracy of PG&E's records and the happenstance means by which this most recent instance of erroneous records was discovered. Submitting this provocative information in a routine-appearing document could be seen as an attempt to mislead the Commission and the public on the significance of this new information."

On August 30, 2013, PG&E filed a "Verified Statement" by M. Kirk Johnson, its Vice-President for Gas Transmission, Maintenance and Construction, explaining how the "discrepancies" in Lines 101 and 147 were discovered and how PG&E responded.

### The OSC Hearing

The OSC was the subject of a hearing held on September 6, 2013 before three PUC Commissioners (Ferron, Florio, and Sandoval) and two administrative law judges

13

(ALJ), including the chief judge.[9]  The sole witness was Joseph M. Malkin, PG&E's lead counsel, who had practiced before the Commission for 28 years, the last three years of which was devoted exclusively to representing PG&E before the Commission.[10]  In addition to questioning by the Commissioners and ALJs, Lead Counsel was questioned by counsel for the City of San Bruno, the Commission's Safety and Enforcement

---

[9] The practice of the PUC is to "assign one or more commissioners to oversee the case and an administrative law judge where appropriate."  (§ 1701.1, subd. (b); see Cal. Const., art. XII, § 2 ["Any commissioner as designated by the commission may hold a hearing or investigation or issue an order subject to commission approval"].)  If a hearing is required, the issues to be examined and procedures to be followed are spelled out in a "scoping memo."  (§ 1701.2, subd. (a); Cal. Code Regs., tit. 20, §§ 1.3(f), 13.2(a).)  A decision must be made within 60 days of the hearing, and can be appealed to the full commission within 30 days.  (§ 1701.2, subd. (a).)  These procedures govern regardless of whether the hearing concerns a quasi-legislative, an adjudicatory, or a ratesetting hearing.  (§§ 1701.1, subd. (a), 1701.2, subd. (a), 1701.3, subd. (a), 1701.4, subd. (a).)  A case where the Commission considers imposing monetary penalties is an adjudicatory matter.  (See § 1701.2, subd, (e); *Pacific Bell Wireless, LLC v. Public Utilities Com.* (2006) 140 Cal.App.4th 718, 739–740; 53 Cal.Jur.3d (2012) Public Utilities, § 96, pp. 130–132.)

The presence of two ALJs was explained in the OSC:  "Ensuring that parties understand the importance of complying with the letter and spirit of the Commission's Rules of Practice and Procedure is a duty of the Chief Administrative Law Judge.  The facts of this matter appear to implicate the core principles upon which the Rules are based.  For that reason, the undersigned Chief Administrative Law Judge is taking the unusual step of co-presiding with the assigned Administrative Law Judge at this important hearing."

[10] Because it appears at many points in the Commission's decisions under review, we adopt the Commission's usage of referring to Mr. Malkin as "Lead Counsel."

Section 2109 provides:  "In construing and enforcing the provisions of this part relating to penalties, the act, omission, or failure of any officer, agent, or employee of any public utility, acting within the scope of his official duties or employment, shall in every case be the act, omission, or failure of such public utility."  In other words, by signing the Errata and representing PG&E at the hearing, Lead Counsel *was* PG&E, and everything he did and said is fully attributable to PG&E.  We do not understand PG&E to argue otherwise.

14

Division (SED)[11], and The Utility Reform Network (TURN). The gist of Lead Counsel's testimony was that the Errata was filed on his responsibility, with no intent to mislead, but only to correct erroneous information previously provided to the PUC in good faith, in "a completely unique situation" that unquestionably had to be brought to the Commission's attention. As for the matter of the timing of submission of the Errata for filing, Lead Counsel explained that the submission before the start of a long Fourth of July weekend was not done to escape attention, but was motivated by nothing other than his belief "we should file as quickly as we could once we had everything nailed down." Directly asked by another attorney for PG&E "did you at any time in connection with the preparation, the titling, or the filing of the errata intend to mislead the Commission, the parties, or the public?", Lead Counsel replied, "Absolutely not."

Counsel for TURN asked "Can you tell us why this pleading [i.e., the Errata] does not include the fact that this discovery was made eight to nine months prior to the date of the pleading?" Lead Counsel answered, "For purposes of this pleading, which was to provide notice to the Commission and the parties that there were errors and how they were corrected, that seems to me like way too much information." And responding to a question from a commissioner, Lead Counsel testified that PG&E was not "trying . . . to sneak something below the radar."

Thereafter the Commission received written submissions. PG&E filed "comments," which for the first time raised the issue of whether a violation of Rule 1.1 required a mental state related to misleading the Commission, and arguing that PG&E had not "acted with any intent to mislead in connection with the submission of [the Errata]," nor with recklessness or gross negligence. PG&E further argued that "[n]o evidence supports a Rule 1.1 violation based on the July 3rd service date."

The City of San Bruno argued that the Errata "was submitted to the Commission as [a] mere artifice to mislead all parties in order to minimize PG&E's responsibility for

---

[11] At some point in 2013 not shown in the record, the Commission's Consumer Protection and Safety Division had been renamed the Safety and Enforcement Division.

past and ongoing deficiencies in its records." In its words: "PG&E obscured the significance of its Line 101 and 147 errors via the artifice of an 'errata' filing precisely because the circumstances surrounding the faulty records for and operation of Lines 101 and 147 are identical to those that precipitated the disaster in San Bruno. After spending hundreds of millions of dollars . . . PG&E's records are still dead wrong. Those inaccuracies, along with the fact that PG&E tried to camouflage its ongoing problems with an obscure regulatory filing rather than be forthcoming ought to scare this Commission, Commission staff, and every customer in PG&E territory because PG&E's behavior is still dangerous. [¶] . . . [¶] Not only does bad data for Lines 147 and 101 demonstrate that the Commission cannot trust PG&E's records system, it also demonstrates that the Commission . . . cannot trust PG&E to uphold its Rule 1.1 obligations to be forthcoming, truthful and complete with its regulators."

SED's opening brief was uncompromising: PG&E misled the Commission. Specifically:

"PG&E's misleading information permitted PG&E to unsafely raise its MAOP throughout the system, in violation of the Commission's directives and standards. PG&E failed to timely and accurately inform the Commission of errors and incompleteness in its MAOP validation process violating Decision . . . 11-12-048. The decision lifted MAOP restrictions based on PG&E's assurances that the MAOP validation process was subject to careful quality assurance procedures and had been completed.

"PG&E first learned of possible errors in its MAOP validation process on October 18, 2012 but failed to inform the Commission until July 3, 2013, more than eight months after PG&E . . . learned of these errors. When PG&E finally disclosed this information to the Commission, the utility further misled the Commission by attempting to de-emphasize and in effect hide errors in the validation process through an 'Errata' rather than a petition for modification of . . . [Decision] 11-02-016 for information concerning possible errors in PG&E's MAOP validation process.

16

"SED contends that PG&E's conduct in this proceeding regarding critical maximum pressure on segments in its transmission system warrants penalties for violations of Rule 1.1 because:

"PG&E knew as early as October 18, 2012, that errors and records insufficiencies existed in its Pipeline Features List used to validate maximum segment pressures;

"Rather than advising the Commission as a regulatory body in writing of these errors, PG&E first chose to communicate with a Commission staffer, who acted in an advisory capacity only. SED advocacy staff did not learn of PG&E's contact with this individual until after the initiation of this Order to Show Cause;

"PG&E failed to provide this staffer with requested documents and information concerning the errors until the end of May 2013, and further misrepresented to the Commission in this OSC proceeding the contact's reaction to the information provided by PG&E (no staff personnel has ratified or approved PG&E's submissions);

"PG&E delayed notifying the Commission and parties of the potential errors in its MAOP validation process until July 3, 2013, some eight months after PG&E first recognized the potential error in its validation process;

"PG&E was aware of SED's continuing data request concerning potential errors in PG&E's MAOP Validation process but failed to notify SED; and

"Using an Errata to notify the Commission of errors in the pipeline features list used in PG&E's critical MAOP Validation process—effectively disguising rather than clearly identifying the serious errors in its MAOP calculations." (Footnote omitted.)

SED also scoffed at PG&E's defense: "PG&E contends that using the term 'errata' is nothing more than '[lead] counsel's good faith selection of a word that conveyed that the pleading was reporting errors . . . such as "an error in printing or writing." ' . . . SED strongly disagrees. The errors in PG&E's PFL [pipeline features list], and the questions such errors pose for PG&E's MAOP validation process of the 2,088 segments that were reviewed, raise serious concerns regarding the safety of segments hydro tested blindly without sufficient knowledge . . . ." "Hydro tests performed at too high a pressure can result in failure or worse, a pinhole leak or crack

17

that may expand in time causing a rupture. PG&E's discovery of MAOP validation errors in its PFL should have been reported shortly after discovery . . . . [¶] . . . PG&E failed to provide the Commission with notice of errors in its PFL in a reasonable period of time after discovery. As a result, the Commission was led to believe that hydro tests on PG&E's . . . [gas] lines had been performed in a safe manner, using accurate . . . data, when, in fact, the data was inaccurate leading to the possible over pressuring of lines during hydro tests."

A crucial point of SED's brief was that it treated each day of the eight months between October 18, 2012 and July 2, 2013 as part of a continuing violation. TURN made the same point in its brief: "PG&E should be required to pay the maximum $50,000 fine for each day of its Rule 1.1 violation. A continuing violation from October 24, 2012 to July 3, 2013, a total of 253 days, multiplied by the maximum $50,000 per violation yields a fine of $12,650,000."

The assigned ALJ's proposed decision concluded that PG&E "violated Rule 1.1 of the Commission's Rules of Practice and Procedure by not correcting promptly a material misstatement of fact in a pleading filed with the Commission and by mischaracterizing the correction when filed as a routine and non-substantive correction. PG&E is fined $6,750,000 for these violations." The fine, which treated both violations as continuing and deserving of the maximum $50,000 per day, was calculated as follows: "We begin the tabulation at the day PG&E first became obligated to inform the parties of the error in its representations to the Commissions, March 20, 2013 [the date PG&E "informed Commission staff of its error and . . . correction of the pipeline features calculation"], a delay of 105 days. We assess the maximum statutory fine of $50,000 per day for this continuing violation . . . . The resulting fine is $5,250,000. [¶] For submitting a misleadingly entitled document, $50,000 per day for 30 days it remained pending at the Commission, when PG&E could have retrieved and corrected it=$1,500.000."

Commissioner Ferron submitted an alternate proposed decision. He disagreed with the assigned ALJ only in the manner he believed PG&E should be sanctioned. Commissioner Ferron would run the $50,000 per day penalty for not revealing the

18

discovered information from November 16, 2012 (the date on which "senior management of PG&E" became aware of the situation) to August 30, 2013 (the date on which PG&E filed the Verified Statement of its Vice-President of Gas Transmission, Maintenance and Construction). This was a total of 287 days, making the penalty for this violation $14,350,000. He would add a penalty for "submitting a misleadingly titled and factually incomplete document, $50,000 per day for the 58 days it remained uncorrected at the Commission=$2,900,000."

**The Full Commission Hearing**

The matter was then considered by the full Commission (Commissioners Ferron, Florio, Peevey, Peterman, and Sandoval), which heard arguments at a public hearing on December 2, 2013. PG&E's initial argument was given by Tony Earley, its Chairman and CEO, to "underscore[] how seriously we take the issues at hand today." According to him, "looking back from a safety standpoint, I think that our staff did all the right things. I found no action that constituted an intentional effort to mislead the Commission." Earley was followed by Nick Stavropoulos, PG&E's Executive Vice President of Gas Transmission, Maintenance and Construction, who, like Earley, had joined PG&E two years before, and who emphasized the "safety culture we are nurturing at PG&E." The Commission then heard from representatives of San Bruno and the SED, and final arguments by Earley and Stavropoulos.

On December 19, 2013, the Commission filed Decision 13-12-053, concluding that PG&E "violated Rule 1.1 of the Commission's Rules of Practice and Procedure by not correcting promptly a material misstatement of fact in a pleading filed with the Commission and by mischaracterizing the correction submitted for filing on July 3, 2013 as a routine and non-substantive correction. PG&E is fined $14,350,000 for these violations."

Concerning what it called "Delay in Correcting Record," the Commission stated: "[T]he admissions by PG&E's Vice President [of Gas Transmission, Maintenance and Construction], coupled with the serious nature of the discrepancies, the widespread knowledge throughout the gas division of this discovery, and the additional steps taken to

19

address this problem, lead us to conclude that senior management either knew or should have known about the serious records discrepancies and pipeline flaws shortly after they were discovered and that this was a significant safety matter in the public's interest." Adopting a phrase that appeared in the proposed decision of both the assigned ALJ and Commissioner Ferron, the Commission found: "It is not credible that PG&E's engineers and executives did not recognize the provocative nature of these facts in light of the intense public interest in natural gas pipeline safety. This is particularly true where, as here, Line 147 had been the subject of a pressure increase proceeding at the Commission the previous year."

The Commission continued:

"The date when PG&E's top management became aware of the true nature of the pipeline is not determinative of whether PG&E should be accountable for its failure to inform the Commission promptly of the erroneous information underlying [Decision] 11-12-048. Given the importance of ensuring the integrity and safety of the transmission system, PG&E should have had internal procedures in place to ensure that incidents such as the discovery of record discrepancies for Line 147 would be relayed promptly to top management and reported to the Commission. [¶] . . . [¶]

"When the Commission has issued a decision in a formal proceeding where a key Ordering Paragraph sets a safety standard that relies on material information later found to be erroneous, the proper method for a party to bring this to the Commission's attention would be through a prompt filing in the proceeding, which could be a motion to reopen the record or a petition for modification of the decision, depending on the circumstances. Since PG&E became aware of record discrepancies beginning on October 18, 2012, we find that PG&E should have prepared and submitted a filing to inform the Commission of this significant and material discovery no later than November 16, 2012. [¶] . . . [¶] . . . Once PG&E had knowledge of material errors in its filed Supporting Information that the Commission relied upon to set a safety standard in [Decision] 11-12-048, PG&E should have brought the record discrepancies to the Commission's attention through an appropriate filing while it investigated . . . . By omission, PG&E's failure to promptly

20

make such a filing misled the Commission by allowing a 'false statement of fact' within the meaning of Rule 1.1 to remain uncorrected after PG&E had the knowledge to correct it. [¶] . . .

"Instead of informing the Commission promptly, PG&E waited over seven months to correct information that it knew to be incorrect and that it knew the Commission had relied upon in issuing [Decision] 11-12-048. PG&E did not attempt to correct the record . . . or inform the parties until July 3, 2013, when it submitted the Errata document for filing and served the parties."

"To summarize, we find that PG&E's obligation to inform the Commission of the errors in its 2011 Supporting Information that was relied on in Ordering Paragraph 1 setting a safety standard in [Decision] 11-12-048 began no later than November 16, 2012. PG&E did not attempt to inform the Commission of the errors until July 3, 2013, a delay of 229 days. This unreasonable delay misled the Commission by allowing a 'false statement of fact' to persist uncorrected and was a violation of Rule 1.1. We find that this constitutes a continuing violation within § 2108. Thus, we conclude that this Rule 1.1 violation persisted for 229 days."

The Commission then turned to a discussion of the "Errata":

Concerning the "Title, Content, and Submission Date of the 'Errata' Document," the Commission first noted that such a document was prohibited by Rule 1.12(c). It then reasoned: "The record on Line 147 had been closed and the Commission decision issued. At a minimum, in light of the circumstances here, the record needed to be re-opened and corrected, and for a more complete resolution. [Decision] 11-12-048 should have been modified to reflect the correct maximum allowing operating pressure." Lead Counsel's testimony why "he rejected using an Amendment . . . [¶] . . . is not credible because it is not logical. The Lead Counsel, with decades of experience, admits that notice of the corrections was 'absolutely required.' Then, he dismissed use of an amendment because the record was closed; but the record was equally closed for the errata. No explanation was offered for this flawed logic."

21

"Further, the 'Errata' submitted for filing is a short document with only one page devoted to a brief description of the errors in the MAOP validation records submitted previously for Line 147 and the resulting need to reduce the MAOP from the 365 psig authorized by [Decision] 11-12-048 to 330 psig. The 'Errata' did not disclose, for example, when or how PG&E became aware of the errors, the reasons for the errors, or corrective actions that were being taken following discovery of the errors."

"In sum, the Lead Counsel chose to submit for filing a document which, while not provided for in the Rules of Practice and Procedure, is typically used to inform parties of minor changes and corrections in documents, most commonly prior to the original document being offered for the record, but in any event before the Commission issues its decision. This submission had the effect of concealing from the Commission and the parties the actual nature of the document. [¶] . . . In addition to not being timely, . . . we find that PG&E's attempted July 3rd filing of the 'Errata' was not forthright, both because of the title and the incomplete content."

"Because the document presented by PG&E for filing with the Commission on July 3, 2013 did not clearly convey the nature or significance of the facts set forth within, we find that it was an artifice, as that term is used in Rule 1.1, and misled the Commission. The misleading nature was exacerbated by the submission date of July 3, before a holiday weekend. [¶] We conclude that PG&E's submission of the 'Errata' document was a separate violation of Rule 1.1.[12] This shortcoming remained uncorrected until PG&E filed and served the Verified Statement of its Vice President of

---

[12] At this point the Commission dropped a footnote which reads: "In its brief, PG&E argues that we must find specific intent to violate Rule 1.1. The Commission addressed that issue in [Decision] 01-08-019 and found that intent should be considered as an aggravating factor in determining the range of the fine. However, the unique factual history of this matter—the worst tragedy in Commission history, a specific directive for forthright and timely information, and an admitted need for notice—leads us to put the fine at the highest levels. Thus, while the Lead Counsel has admitted that the choice of title was intentional, that is, he intended to and did title the document errata, we need not and do not consider whether specific intent was an aggravating factor in this instance."

22

Gas Transmission Maintenance and Construction on August 30, 2013. We find that this constitutes a continuing violation within § 2108. Thus, we conclude that this Rule 1.1 violation persisted for 58 days."

This is how the Commission fixed the penalty:

"[T]he facts of this proceeding require that we impose the maximum fine. Natural gas transmission system safety *by this operator* has been one of the Commission's highest priorities for three years. The management and legal decision-making regarding the treatment of the discovery of errors in the Line 147 Supporting Information, as reflected in this record, is profoundly disheartening in that it reflects a lack of candor and appreciation of the public interest and the regulatory process.

"Therefore we calculate the fine as follows: For delay in submitting a filing to disclose information regarding errors in pipeline specifications for Line 147, we impose the maximum amount of $50,000 per day as a continuing violation aggravated by the severity of this safety-related offense and the conduct of the utility. We begin the calculation on November 16, 2012, the date by which we find that PG&E should have prepared and submitted a filing to inform the Commission of the significant and material discovery of the records discrepancy and end the calculation on the date that PG&E submitted its Errata document for filing, July 3, 2013, a delay of 229 days. We assess the maximum statutory value [*sic*] of $50,000 per day for this continuing violation based on the history of this proceeding as set forth above. The resulting fine is $11,450,000.

"For submitting a misleadingly titled and factually incomplete document on July 3, 2013, $50,000 per day for the 58 days while this shortcoming remained uncorrected = $2,900.000. Total fine = $14,350,000." (Italics added.)

The Commission then made some "Comments on [the] Alternate Decision" of Commissioner Ferron, one of which is especially germane: "PG&E . . . argues that the Commission must show that PG&E intentionally misled the Commission. However, there is no 'intent' element to a Rule 1.1 violation, either implicitly or explicitly. We have previously held that Rule 1.1 violations have occurred where there has been a lack

23

of candor, withholding of information, or failure to correct information or respond fully to data requests. [Fn. to four PUC decisions.]"

In Decision 14-05-034, the Commission denied PG&E's request for rehearing, rejecting PG&E's arguments that: (1) "The Commission erred in finding violations of Rule 1.1 without proof that PG&E intended to misled the Commission"; (2) "The Commission erred in finding 'continuing violations' of Rule 1.1 without proof that any misconduct was continuing"; and (3) the penalty imposed violated the prohibitions against excessive fines in the United States and California constitutions, and also violated the due process clauses of those documents. These are the issues PG&E brings for review.

## ANALYSIS

### The Scope of Our Review

"Within 30 days after the commission issues its decision denying the application for a rehearing, . . . any aggrieved party may petition for a writ of review in the court of appeal . . . for the purpose of having the lawfulness of the original order or decision or of the order or decision on rehearing inquired into and determined." (§ 1756.)

"[T]he review by the court shall not extend further than to determine, on the basis of the entire record . . . , whether any of the following occurred: [¶] (1) The commission acted without, or in excess of, its powers or jurisdiction. [¶] (2) The commission has not proceeded in the manner required by law. [¶] (3) The decision of the commission is not supported by the findings. [¶] (4) The findings in the decision of the commission are not supported by substantial evidence in light of the whole record. [¶] . . . [¶] (6) The order or decision of the commission violates any right of the petitioner under the Constitution of the United States or the California Constitution." (§ 1757, subd. (a).)

"Notwithstanding Section . . . 1757 . . . , in any proceeding wherein the validity of any order or decision is challenged on the ground that it violates any right of petitioner under the United States Constitution or the California Constitution, the Supreme Court or court of appeal shall exercise independent judgment on the law and the facts, and the

24

findings or conclusions of the commission material to the determination of the constitutional question shall not be final." (§ 1760.)

Thus, when no constitutional issue is presented, a PUC decision has the same standing as a judgment of the superior court: it is presumed correct, and any party challenging the decision has the burden of proving that it suffers from prejudicial error. (*City and County of San Francisco v. Public Utilities Com*. (1985) 39 Cal.3d 523, 530; *Toward Utility Rate Normalization v. Public Utilities Com*. (1978) 22 Cal.3d 529, 537; *Southern California Edison Co. v. Public Utilities Com*. (2014) 227 Cal.App.4th 172, 185.) Indeed, our Supreme Court has repeatedly called the presumption in favor of the Commission's decision a "strong" one. (*Greyhound Lines, Inc. v. Public Utilities Com*. (1968) 68 Cal.2d 406, 410 ["There is a strong presumption in favor of the validity of the commission's decisions"]; *Pacific Tel. & Tel. Co. v. Public Util. Com*. (1965) 62 Cal.2d 634, 647 ["strong presumption of the correctness of the findings . . . of the commission, which may choose its own criteria or method of arriving at its decision"].)

But even the presence of a constitutional dispute does not require the reviewing court to adopt de novo or independent review. Even there, "the question of the weight of the evidence in determining issues of fact lies with the commission acting within its statutory authority; the 'judicial duty to exercise an independent judgment does not justify disregard of the weight which may properly attach to findings upon hearing and evidence.' " (*Pacific Tel. & Tel. Co. v. Public Util. Com.*, *supra*, 62 Cal.2d 634, 646.) In other words, judicial reweighing of evidence and testimony is ordinarily not permitted. (See, e.g., *Toward Utility Rate Normalization v. Public Utilities Com.*, *supra*, 22 Cal.3d 529, 538 [" 'When conflicting evidence is presented from which conflicting inferences can be drawn, the commission's findings are final' "]; *Pacific Tel. & Tel. Co. v. Public Util. Com.*, *supra*, at p. 647 [findings which are final include those involving "conflicting evidence [or] undisputed evidence from which conflicting inferences may reasonably be drawn"]; *Cal. Portland Cement Co. v. Public Util. Com.* (1957) 49 Cal.2d 171, 175 ["The weighing of whatever factors may have tended [to support an implied finding by the PUC] . . . was a matter within the exclusive jurisdiction of the commission]; *The Utility*

25

*Reform Network v. Public Utilities Com.* (2014) 223 Cal.App.4th 945, 959; *In re Groundwater Cases* (2007) 154 Cal.App.4th 659, 681; cf. *SN Sands Corp. v. City and County of San Francisco* (2008) 167 Cal.App.4th 185, 191 [same approach taken to review of county public utilities commission].)  The only exception is those findings or conclusions "drawn from undisputed evidence . . . from which conflicting inferences may not reasonably be drawn [and therefore] present questions of law." (*Pacific Tel. & Tel. Co. v. Public Util. Com.*, *supra*, at p. 647.)

To accomplish the overturning of a Commission finding for lacking the support of substantial evidence, the challenging party must demonstrate that based on the evidence before the Commission, a reasonable person could not reach the same conclusion. (*Clean Energy Fuels Corp. v. Public Utilities Com.* (2014) 227 Cal.App.4th 641, 649; *The Utility Reform Network v. Public Utilities Com., supra*, 223 Cal.App.4th 945, 959.)  It is for this reason that the Commission's factual findings are almost always treated as " 'conclusive' " (*American Toll Bridge Co. v. Railroad Com.* (1938) 12 Cal.2d 184, 192), "final and not subject to review." (*City and County of San Francisco v. Public Utilities Com.*, *supra*, 39 Cal.3d 523, 530.)

The special respect accorded the PUC as a constitutional entity also appears in the considerable deference extended to what might otherwise appear purely judicial functions.  Courts have long accepted the principle that "the commission's interpretation of the Public Utilities Code should not be disturbed unless it fails to bear a reasonable relation to statutory purposes and language . . . ." (*Greyhound Lines, Inc. v. Public Utilities Com.*, *supra*, 68 Cal.2d 406, 410–411;[13] accord, *Southern California Edison Co.*

---

[13] One of the sources for this conclusion was Netterville, *Administrative "Questions of Law" and the Scope of Judicial Review in California* (1956) 29 So.Cal. L. Rev. 434, 451–453.  The relevant discussion on page 453 ends with the following: "[T]he agency's choice of a set of legal inferences and legal conclusions from among a number of *possible* choices can rarely be said to be an abuse of discretion.  It is, on the contrary, an exercise of the most useful kind of discretion which any agency could exercise. As long as the agency's choice has evidentiary support in the record and the legal inferences and conclusions drawn therefrom show a reasonable relation to its task of effectuating the broad statutory purposes, the court will not interfere.  The commission, in

*v. Peevey* (2003) 31 Cal.4th 781, 796; *PG&E Corp. v. Public Utilities Com.* (2004) 118 Cal.App.4th 1174, 1194.)  This judicial deference acknowledges a role for the Commission's administrative expertise:  "[W]e give presumptive value to a public agency's interpretation of a statute within its administrative jurisdiction because the agency may have 'special familiarity with satellite legal and regulatory issues,' leading to expertise expressed in its interpretation of the statute."  (*Pacific Bell Wireless, LLC v. Public Utilities Com.* (2006) 140 Cal.App.4th 718, 729; accord, *Southern California Edison. Co. v. Public Utilities Com.*, *supra*, 227 Cal.App.4th 172, 185; *SFFP, L.P. v. Public Utilities Com.* (2013) 217 Cal.App.4th 784, 794.)

The deference may, if anything, be even greater with regulations promulgated by the agency.  "[T]he PUC's interpretation of its own regulations and decisions 'is entitled to consideration and respect by the courts.  [Citation.]  . . . " 'A court is more likely to defer to an agency's interpretation of its own regulation than to its interpretation of a statute, since the agency is likely to be intimately familiar with regulations it authored, and sensitive to the practical implications of one interpretation over another.' " [Citation.]' "  (*Clean Energy Fuels Corp. v. Public Utilities Com.*, *supra*, 227 Cal.App.4th 641, 649; see *The Utility Reform Network v. Public Utilities Com.*, *supra*, 223 Cal.App.4th 945, 958 ["The Commission's interpretation of its own rules and regulations 'is entitled to consideration by the courts.' "].)

All that being said, with either statute or regulation, the ultimate decision is with the courts.  (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11–12; *Carmona v. Division of Industrial Safety* (1975) 13 Cal.3d 303, 310; *PG&E Corp. v. Public Utilities Com.*, *supra*, 118 Cal.App.4th 1174, 1194–1195.)

---

such a case is in as good, if not better position than the court, to make the choice from among the possible and reasonable choices available."

## The Issues Presented

As shown by the captions in its petition, this is how PG&E frames the issues for decision: (1) "The Commission Erred in Holding That a Violation of Commission Rule 1.1 Does Not Require Proof of an Intent to Mislead the Commission"; (2) "The Commission Erred in Holding That Continuing Violations of Rule 1.1 May Be Found Without Proof of Continuing Misconduct"; and (3) "The Commission's Decision Violates PG&E's Rights Under the California and United States Constitution," specifically: "The Commission found PG&E guilty of Rule 1.1 violations that the Commission failed to identify in advance of the hearing, in contravention of the Due Process Clause, and imposed fines of millions of dollars for unintentional reporting and filing errors that caused no harm and were not accompanied by any improper intent, in violation of the Excessive Fines Clause."

## The Commission Can Find a Rule 1.1 Violation Without Requiring a Mental State to Mislead

PG&E's opening contention attacks the PUC's conclusion that "there is no 'intent' element to . . . Rule 1.1." PG&E asserts that this conclusion suffers from numerous defects, in connection with which PG&E advances five supporting arguments, which will hereafter be referred to as "subarguments." The subarguments are these: One, the Commission neglected to recognize "[t]hat Rule 1.1 incorporate[d] an intent element is . . . mandated by the language of the Rule itself," because "[a]ll of the key terms in its provision—'to mislead,' 'artifice,' and 'false statement'—denote purposefully deceptive conduct." Two, PUC's conclusion "breaks from the Commission's own prior decisions." Three, "The Commission's interpretation . . . also conflicts directly with decisions interpreting *identical* language in provisions of the California Rules of Professional Conduct and [the] Business and Professions Code." Four, "Interpreting Rule 1.1 to include an intent element is further supported by the presumption against strict liability," which "holds that a statute or regulation defining an offense is generally presumed to require proof of intent, even when no *mens rea* element is specifically stated." And five, PUC's construction of Rule 1.1 "opens the door to new and significant risks of liability

28

for all parties appearing before the Commission, given the ever-present possibility that a particular filing may be deemed to be procedurally improper or to have somehow 'misled' the Commission or its staff, potentially allowing for the imposition of fines in the millions of dollars for representations made by a party in complete good faith."

It is clear from some of the language used by PG&E ("offense," "strict liability," "mens rea"), its copious citation of criminal authorities, and its invocation of constitutional provisions linking excessive fines to cruel and/or unusual punishment,[14] that PG&E is trying to insinuate that Rule 1.1 be treated as a species of penal statute.[15] From this premise PG&E hopes to have a mental state element implied to avoid having a Rule 1.1 violation treated as a strict liability offense. These efforts must be disappointed.

It is true that, according to repeated pronouncements from our Supreme Court, "[t]he prevailing trend in the law is against imposing criminal liability without proof of some mental state where the statute does not evidence the Legislature's intent to impose strict liability." (*In re Jennings* (2004) 34 Cal.4th 254, 267; accord, *Stark v. Superior Court* (2011) 52 Cal.4th 368, 393; *People v. Simon* (1995) 9 Cal.4th 493, 521.) But this trend does not apply to statutes imposing civil penalties for noncompliance with measures intended to protect the public health and safety. These penalties are not penal offenses, as is also shown by decisions by our Supreme Court.

---

[14] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted." (U.S. Const., 8th Amend.) "Cruel or unusual punishment may not be inflicted or excessive fines imposed." (Cal. Const., art. I, § 17.)

[15] Of course, Rule 1.1 is not a statute, but a regulation promulgated by the PUC. But Rule 1.1 cannot be divorced from section 2107, for the statute—together with the very broad enabling power to "do all things . . . which are necessary and convenient" granted by section 701—is the source of the authority to impose monetary sanctions for violation of the rule. The rule is an organic extension of the statute, and the validity of the rule cannot be considered while ignoring the statute. Section 2107 and Rule 1.1 are clearly in pari materia and are to be construed together, along with section 701. (See *Hoitt v. Department of Rehabilitation* (2012) 207 Cal.App.4th 513, 523–524; *Mittelman v. Seifert* (1971) 17 Cal.App.3d 51, 77–78.) This conjunction is implicit in our analysis, and references to Rule 1.1 are to be understood as also referencing sections 2107 and 701.

" 'While . . . civil penalties may have a punitive or deterrent aspect, their primary purpose is to secure obedience to statutes and regulations imposed to assure important public policy objectives.' " (*California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 294–295, quoting *Kizer v. County of San Mateo* (1991) 53 Cal.3d 139, 147–148, italics added.) "It is . . . well accepted that a state may impose reasonable penalties as a means of securing obedience to statutes validly enacted under the police power . . . . Imposition of civil penalties has, increasingly in modern times, become a means by which legislatures implement statutory policy." (*Hale v. Morgan* (1978) 22 Cal.3d 388, 398.) "[T]he legislature may constitutionally impose reasonable penalties to secure obedience to statutes enacted under the police power, so long as those enactments are procedurally fair and reasonably related to a proper legislative goal." (*Kinney v. Vaccari* (1980) 27 Cal.3d 348, 352.)

Without question, the PUC operates pursuant to the state's police power. (E.g., *Gt. Northern Ry. v. Washington* (1937) 300 U.S. 154, 159; *Sutter Butte Canal Co. v. R. R. Comm'n.* (1929) 279 U.S. 125, 139; *Pacific Tel. & Tel. Co. v. Superior Court* (1963) 60 Cal.2d 426, 428.) And PG&E does not dispute that the Commission has the authority to impose monetary sanctions for disobedience of its orders made pursuant to the state's police power.

When the Legislature meant to criminalize a violation of the Commission's authority, it knew how to do so in unmistakable language.[16] When the Legislature meant

---

[16] "Every public utility and every officer, agent, or employee of any public utility, who violates or fails to comply with, or who procures, aids, or abets any violation by any public utility of any provision of the California Constitution or of this part, or who fails to comply with any part of any order, decision, rule, direction, demand, or requirement of the commission, or who procures, aids, or abets any public utility in the violation or noncompliance in a case in which a penalty has not otherwise been provided, is guilty of a misdemeanor and is punishable by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both fine and imprisonment." (§ 2110.)

"Every person who, either individually, or acting as an officer, agent, or employee of a corporation other than a public utility, violates any provision of this part, or fails to

to require a mental state for an act committed before the Commission, it knew how to do so in plain language.[17]  And when the Legislature meant a party's good faith to be

comply with any part of any order, decision, rule, direction, demand, or requirement of the commission, or who procures, aids, or abets any public utility in such violation or noncompliance, in a case in which a penalty has not otherwise been provided for such person, is guilty of a misdemeanor, and is punishable by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not exceeding one year, or by both such fine and imprisonment."  (§ 2112.)

"Any public utility on whose behalf any agent or officer thereof who, having taken an oath that he will testify, declare, depose or certify truly before the commission, willfully and contrary to such oath states or submits as true any material matter which he knows to be false, or who testifies, declares, deposes, or certifies under penalty of perjury and willfully states as true any material matter which he knows to be false, is guilty of a felony and shall be punished by a fine not to exceed five hundred thousand dollars ($500,000)."  (§ 2114.)

[17] "Every corporation or person, other than a public utility and its officers, agents, or employees, which or who *knowingly* violates or fails to comply with, or procures, aids or abets any violation of any provision of the California Constitution relating to public utilities or of this part, or fails to comply with any part of any order, decision, rule, direction, demand, or requirement of the commission, or who procures, aids, or abets any public utility in the violation or noncompliance, in a case in which a penalty has not otherwise been provided for the corporation or person, is subject to a penalty of not less than five hundred dollars ($500), nor more than fifty thousand dollars ($50,000) for each offense."  (§ 2111, italics added.)

"Any public utility on whose behalf any agent or officer thereof who, having taken an oath that he will testify, declare, depose or certify truly before the commission, *willfully* and contrary to such oath states or submits as true any material matter *which he knows to be false*, or who testifies, declares, deposes, or certifies under penalty of perjury and willfully states as true any material matter *which he knows to be false*, is guilty of a felony and shall be punished by a fine not to exceed five hundred thousand dollars ($500,000)."  (§ 2114, italics added.)

"Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom.  If the court finds that the act or omission was *wilful*, it may, in addition to the actual damages, award exemplary damages. . . ."  (§ 2106, italics added.)

31

considered, it knew how to say so without ambiguity.[18] The Legislature's decision not to include such qualifying words as "willfully" or "knowingly" when enacting section 2107 indicates that it did not mean to impose a scienter requirement for a violation of "any part or any provision of any order, decision, decree, rule, direction, demand, or requirement of the commission." We are not authorized to insert such a requirement " 'to conform to an assumed intention which does not appear from its language.' " (*Napa Valley Wine Train, Inc. v. Public Utilities Com.* (1990) 50 Cal.3d 370, 381.)[19]

The absence of such language in section 2107 compels the conclusion that a civil penalty imposed under that statute is not a penal offense—and the rule of strictly construing penal statutes intimated by PG&E has no application. Indeed, the opposite is true: " '[S]tatutes which prescribe only civil monetary penalties' . . . 'for the protection

_____

[18] "Any penalty for violation of any provision of this act, or of any rule, regulation, general order, or order of the commission, involving safety standards for pipeline facilities or the transportation of gas in the State of California may be compromised by the commission. In determining the amount of such penalty, or the amount agreed upon in compromise, the appropriateness of such penalty to the size of the business of the person charged, the gravity of the violation, and *the good faith of the person charged* in attempting to achieve compliance, after notification of a violation, shall be considered. . . ." (§ 2104.5, italics added.)

[19] We would reach the same result if we examined Rule 1.1 without reference to section 2107. As stated at the start of this opinion, Rule 1.1 was promulgated by the Commission pursuant to its power under section 1701 to adopt "rules of practice and procedure." When the PUC intends to require that an act or omission be done with a specified mental state, it knows how to frame regulations expressing that intent. (See, for example, Cal. Code Regs., tit. 20, §§ 1672(m) [entities performing home energy ratings or audits "shall not knowingly provide untrue, inaccurate, or incomplete rating information or report rating results"]; 1674 [entity that applies to be certified as a home energy rating provider must furnish "A statement that the [entity] . . . will not knowingly fail to comply with the requirements of these regulations"]; and 2841(c)(1) [PUC "may rescind approval of a Registry Service Provider" if the provider "is guilty of . . . gross negligence"].) The Commission did not do so when it promulgated Rule 1.1. In that the same rules of construction govern both statutes and regulations promulgated by an administrative agency (*Guzman v. County of Monterey* (2009) 46 Cal.4th 887, 898; *Cal. Drive-In Restaurant Assn. v. Clark* (1943) 22 Cal.2d 287, 292), we are no less precluded from reading such a requirement into Rule 1.1 as we are from inserting it into section 2107.

32

of the public are . . . broadly construed in favor of that protective purpose.' " (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 92, quoting *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 312–313.)

PG&E characterizes the Errata as an innocent mistake "made . . . in complete good faith," which "did not cause any harm and did not pose any risk to the Commission, its staff, any party, or the public." This completely misperceives what the PUC believed was at issue.[20] Statutes such as section 2107 would have virtually no deterrent impact if the utility were penalized only upon the actual occurrence of the substantive harm the Commission was trying to avoid. (See *State of California v. City and County of San Francisco* (1979) 94 Cal.App.3d 522, 531.) And the idea that the Commission could not employ that authority to prevent a recurrence of the September 9, 2010 explosion is too preposterous to be entertained. The Commission was not powerless until another explosion launched another segment of underground pipe into Glenview Drive. To validate such an extreme consequence is something we must avoid if at all possible. (See, e.g., *Eel River Disposal & Resources Recovery, Inc. v. County of Humboldt* (2013) 221 Cal.App.4th 209, 227; *Reliable Tree Experts v. Baker* (2011) 200 Cal.App.4th 785, 796–797; *Friends of Bay Meadows v. City of San Mateo* (2007) 157 Cal.App.4th 1175, 1191.)

As we have noted in refusing to accept an argument such as PG&E makes here: "[T]he legitimate police power device of 'securing obedience' . . . requires more than

---

[20] That said, we cannot indulge the factual predicate of PG&E's argument—that the contents of the Errata and the timing of its submission to the Commission—was "innocent." That predicate is, in turn, founded upon a positive interpretation of Lead Counsel's testimony. But the Commission was clearly of the opinion that Lead Counsel and his testimony were *not* credible. The Commission went to the trouble of stating this determination explicitly in its analysis quoted above, then restating it as a conclusion of law, and implicitly adopting it as a "finding of fact" ("The explanation . . . by Lead Counsel . . . is logically flawed"). Such a fact-specific issue as an individual credibility determination—and the corollary issues of deducible inferences—could not be examined here without a wholesale violation of the standards governing our limited scope of review.

compensation of [actual] losses, a penalty that might achieve little or no compliance."[21] (*City and County of San Francisco v. Sainez* (2000) 77 Cal.App.4th 1302, 1315.)  Our Supreme Court is equally unreceptive to challenges to the Commission's powers to impose deterrent penalties:  "Civil penalties under [section 2107] . . . require no showing of actual harm," "are imposed . . . irrespective of actual damage suffered," "without regard to motive," and "require no showing of malfeasance or intent to injure."  (*Kizer v. County of San Mateo*, *supra*, 53 Cal.3d 139, 147.)

This mirrors the position of the Commission.  In language especially pertinent to our inquiry, since at least 1998 the Commission has taken the position that "The purpose of a fine is to go beyond restitution to the victim and to effectively deter further violations . . . . [¶] Effective deterrence . . . is particularly important against violations which could result in public harm, and particularly against those where severe consequences could result."  (*Enforcement Rules, supra,* 84 Cal.P.U.C.2d 167, 188.)  Nor is "harm" narrowly restricted to "the victim"—or even the general "public":  "Many potential penalty cases before the Commission do not involve any harm to consumers but are instead violations of reporting or compliance requirements.  In these cases, the harm may not be to consumers but rather to the integrity of the regulatory processes. . . .  [¶]  . . . [¶] Such compliance is absolutely necessary to the proper functioning of the regulatory process."  (*Ibid*.)

Based on the above, we must reject PG&E's subarguments one and four.  We reject subargument one because it is not so much the plain language of Rule 1.1 that

---

[21] PG&E argues that "it is difficult to see how the fines here will have any real additional deterrent effect, since by the Commission's own holding they could be imposed for violations that are 'inadvertent or unintentional.' "  The answer is obvious: if a utility pays closer attention to PUC directives, and how it responds to those directives, the utility will avoid paying a multi-million dollar penalty, and also escape the public embarrassment of trying to explain why it was penalized.  (See *Final Opinion Adopting Enforcement Rules* (1998) 84 Cal.P.U.C.2d 167, 188 (*Enforcement Rules*) ["Effective deterrence creates an incentive for public utilities to avoid violations. Deterrence is particularly important against violations which *could* result in public harm, and particularly against those where severe consequences *could* result."  Italics added.].)

governs, but the language of section 2107 which, together with sections 701 and 1701, is the head source authority for Rule 1.1. (See fn. 15, *ante*.) The language of section 2107, by itself and when examined with other statutes, establishes that no intent element is "mandated" by that language. And contrary to PG&E's subargument four, section 2107 is not a penal provision requiring strict construction, but is instead a provision that allows for the PUC, in the exercise of its unquestionably legitimate regulatory jurisdiction, to impose civil penalties.

The same reasoning dooms PG&E's subargument three, with its reference to the California Rules of Court and the Business and Professions Code. (See fn. 22, *post*.) The Commission's power to impose monetary deterrent sanctions to ensure compliance with such an unquestionably valid jurisdictional power cannot be overcome by PG&E's reliance upon arguments based on supposedly analogous statutes. PG&E is correct that the statutory tort of deceit does have a scienter requirement. (Civ. Code, § 1710; *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638; 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, §§ 800–807, pp. 1157–1163.) But that requirement is not invariable, and does not exclude the existence of actionable fraud that does not require a mental element. Our State's Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.) is one example that comes to mind. (See *Cortez v. Purolator Air Filtration Products Co*. (2000) 23 Cal.4th 163, 181 ["the plaintiff need not show that a UCL defendant intended to injure anyone through its unfair or unlawful conduct. The UCL imposes strict liability when property or monetary losses are occasioned by conduct that constitutes an unfair business practice"]; *Hewlett v. Squaw Valley Ski Corp*. (1997) 54 Cal.App.4th 499, 520 [same].) "Moreover, tort law recognizes a claim for negligent misrepresentation, which allows recovery in the absence of scienter or intent to defraud (Civ. Code, § 1710, subd. 2; *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173–174) and attaches liability to '[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact.' (Civ. Code, § 1710, subd. 3.) And tort law also recognizes that a party having exclusive knowledge of information materially affecting the value of a transaction may have a duty

35

to disclose that information to the other party even in the absence of a fiduciary relationship.  (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 796, pp. 1151– 1152.)"  (*Los Angeles Unified School Dist. v. Great American Ins. Co*. (2010) 49 Cal.4th 739, 750, fn. 5.)

This approach has found wide acceptance when construing statutes intended to protect the public, even when noncompliance is treated as a misdemeanor.  (E.g., *In re Marley* (1946) 29 Cal.2d 525, 528–530; *Hypertouch, Inc. v. ValueClick, Inc*. (2011) 192 Cal.App.4th 805, 821–822; *Khan v. Medical Board* (1993) 12 Cal.App.4th 1834, 1844– 1845; *People ex rel. Van de Kamp v. Cappuccio, Inc*. (1988) 204 Cal.App.3d 750, 761; *Brodsky v. California State Board of Pharmacy* (1959) 173 Cal.App.2d 680, 688.)  It is only when the violation elevates to felony, and is accompanied by harsher consequences, that an intent element is implied.  (See *In re Jorge M*. (2000) 23 Cal.4th 866, 879–880; *People v. Coria* (1999) 21 Cal.4th 868, 876–878.)

As no misdemeanor or felony prosecution confronts PG&E, we conclude the public protection approach furnishes a more useful and reliable analogue than one aspect of statutory tort law.  The Commission is not concerned with redressing a private wrong to an individual, but with protecting the safety of the general public—not to mention the integrity of the state-wide regulatory authority exercised by the Commission.[22]

The matter of PG&E's subargument two, which is based on the PUC's own prior

---

[22] PG&E's citation of one California statute and a rule of professional conduct, neither of which address public safety, and a handful of irrelevant cases from other jurisdictions, are hardly contrary.

PG&E cites Business and Professions Code section 6068, subdivision (d)—"It is the duty of an attorney to . . . [¶] . . .[¶] . . . never to seek to mislead the judge or any judicial officer by an artifice or false statement or fact of law"—and rule 5-200(B) of the Rules of Professional Conduct—"In presenting a matter to a tribunal, a member: [¶] . . . [¶] . . . Shall not seek to mislead the judge, judicial officer, or jury by an artifice or false statement of fact or law."  PG&E also cites a selective survey of decisions from other states, i.e., the attorney discipline cases of *In re Discipline of Eicher* (S.D. 2003) 661 N.W.2d 354, *In re Leonhardt* (Ore. 1997) 930 P.2d 844, and *In re Norton* (Utah 1944) 146 P.2d 899, and one criminal decision.  (*Turner v. State* (Mo.Ct.App. 1998) 979 S.W.2d 222.)   None of it is pertinent.

decisions, is more problematic. PG&E tells us: "[T]he Commission itself has in prior decisions, contrary to its holding in this case, refused to find a violation of Rule 1.1 or impose sanctions when the alleged misstatement 'was an oversight rather than a deliberate attempt to mislead us,' [citation] or when the record did not 'demonstrate an intent to mislead the Commission.' "

The Commission responds that its prior applications of Rule 1.1 (and its predecessor version, Rule 1) furnish additional support for concluding that scienter is not a sine qua non.[23] The Commission views its past adjudicatory decisions as illustrating the principle that intent has never been deemed essential to finding a violation of the rule against misleading the Commission. In the Commission's words, it "has never held that intent is an absolute prerequisite to finding a Rule 1 violation. A violation may also be established where the utility demonstrates lack of candor, withholds information, or fails to correctly inform or correct mistaken information. [Citations.] [¶] The Commission has also explained that Rule 1 inquiries look to the reasonableness of a utility's conduct, including its compliance with relevant statutes and decisions. [Citation.] In some instances, even inadvertent or unintentional conduct may result in a violation if the effect is to mislead the Commission. . . . [¶] That is not to say intent is not considered at all. However, it goes to the weight to be assigned to a violation. [Citation.] That is, it may be weighed as an aggravating or mitigating factor."

Although the Commission maintains that the line of its decisions is unbroken and

_____

[23] The complete text of Rule 1.1 reads: "Any person who signs a pleading or brief, enters an appearance, offers testimony at a hearing, or transacts business with the Commission, by such act represents that he or she is authorized to do so and agrees to comply with the laws of this State; to maintain the respect due to the Commission, members of the Commission and its Administrative Law Judges; and never to mislead the Commission or its staff by an artifice or false statement of fact or law."

Rule 1.1 derives from the former Rule 1, which was adopted by the PUC in 1950. (*Public Utilities Commission Rules of Practice and Procedure* (1950) 49 Cal.P.U.C. 536, 541.) When renumbered Rule 1.1 in 2006, the only difference was addition of the words "or she." (Cal.P.U.C. Decision 06-07-006 (July 20, 2006), Appen., p. 7.) We appreciate amici providing us with this information.

true, and therefore entitled to deference, we cannot agree. The nonsystematic examination we have made, based on the decisions cited by the parties and amici, leaves us with the impression that the Commission's applications of Rule 1.1 are hardly linear. One illustration from the matter before us will illustrate the point.

When the Commission denied PG&E's application for rehearing, it made the categorical statement that "we have never held that a purposeful intent is a prerequisite to impose Rule 1.1 sanctions." Amici responds with a 2002 decision where the Commission made the equally categorical pronouncement that "Rule 1 violations require purposeful intent, recklessness, or gross negligence in regard to communications with the Commission." (Cal.P.U.C. Decision 02-08-063 (Aug. 22, 2002) [Slip Opn., p. 20].)[24] Yet, in that very same 2002 decision the Commission also cited a 1994 decision in which the Commission had referred to "a line of Commission decisions which holds that situations involving a failure to correctly cite a proposition of law, a lack of candor or withholding of information, and a failure to correctly inform and to correct the mistaken information," which the Commission viewed as "support[ing] the proposition that a violation of Rule 1 *can* result from a reckless or grossly negligent act." (*Id*., citing Cal.P.U.C. Decision 94-11-018 (Nov. 9, 1994 [57 CPUC2d 204], italics added.)

All of this was reiterated in a 2004 decision: "The Commission has recently held that Rule 1 violations require purposeful intent, recklessness, or gross negligence in regard to communications with the Commission. (See D.02-08-063 . . . .) In D.94-11-018, 57 CPUC2d 176, the Commission recognized that a line of prior decisions held that situations involving a failure to correctly cite a proposition of law, a lack of candor, or

---

[24] But at an earlier point in the 2002 decision the Commission made a statement that can hardly bring comfort to PG&E: "This decision should not be interpreted to suggest that parties that transact business with the Commission may rely on oral discussions with Commission employees as a basis for providing in their written submissions and pleadings anything less than the complete and candid disclosure of information that is required by Rule 1." (Cal.P.U.C. Decision 02-08-063, *supra* [Slip Opn., p. 19].) This appears to be the basis for disregarding the discussion between PG&E employees and the PUC staffer following the October 2012 discovery of the misidentified pipe in Line 147. (See fn. 8, *ante*.)

withholding information, and a failure to correctly inform and to correct mistaken information are potential Rule 1 violations, and clarified that a Rule 1 violation can result from such conduct if it is reckless or grossly negligent." (Cal.P.U.C. Decision 04-04-065 (April 22, 2004) [Slip Opn., pp. 35–36].)

Although it may be literally correct that the Commission has never expressly held that Rule 1.1 cannot be violated unless there is intent, recklessness, or gross negligence, one could conclude that it had. That conclusion would only be fortified by considering decisions where the Commission had—most recently during the period while PG&E's application for rehearing was pending—*declined* to impose Rule 1.1 sanctions because a utility's misstatement was treated as "an oversight rather than a deliberate attempt to mislead." (Cal.P.U.C. Decision 14-02-041 (Feb. 27, 2014) [Slip Opn., p. 9, fn. 18]; see Cal.P.U.C. Decision 03-11-023 (Nov. 13, 2003) [Slip Opn., p. 28] [common carrier not sanctioned because evidence did not establish that carrier "knowingly and willfully filed false quarterly reports that understated revenue"]; Cal.P.U.C. Decision 84-08-031(Aug. 1, 1984) [16 CPUC2d 29]), or an "honest mistake." (Cal.P.U.C. Decision 09-01-017 (Jan. 29, 2009) [Slip Opn., p. 6].) But against these comments is the 2009 decision in which the Commission determined that a utility "is subject to a penalty for its violation of Rule 1.1, even if the violation was inadvertent." (Cal.P.U.C. Decision 09-04-009 (April 16, 2009) [Slip Opn, p. 15].)

Then there are decisions from 1990, 1992, and 2001 that hardly clarify things. In the 1990 decision, attorneys for a utility sent to the Commission a number of letters containing false information. What the utility tried to dismiss as a simple mistake, the PUC denounced as "sharp dealing," sanctionable under Rule 1: "U.S. West, by its attorney's letters . . . , misled the Commission and its staff, leading to the approval of Resolution T-13052, approving Advice Letter 8-A. U.S. West took full advantage of the 'mistake' it had implanted, and by failing within a reasonable time . . . to bring this 'mistake' and the resulting language ambiguity to the attention of the Commission, persisted in further sharp dealing." (Cal.P.U.C. Decision 90-01-013 (Dec. 6, 1990) [38 CPUC2d 420–421].)

In the 1992 decision, the Commission determined that a gas pipeline utility had improperly assigned certain gas pipeline capacity rights to an affiliate, further determining that the utility had violated Rule 1 by misrepresenting the status of the affiliate's "transportation rights "in a report filed with the Commission. (Cal.P.U.C. Decision 92-03-042 (March 11, 1992) [43 CPUC2d 501–502].) The Commission denied the utility's application for rehearing on the issue of whether it had violated Rule 1. The language used in doing so merits quotation at length:

"There is sufficient evidence and legal basis to support our determination that SoCalGas violated Rule 1 by misleading the Commission as to the status of the PITCO transportation arrangements in the report it filed with the Commission on December 31, 1991. SoCalGas executed the capacity assignment on December 26, 1991, but did not make this fact known to the Commission in the report it filed on December 31, 1991. Rather, SoCalGas incorrectly informed the Commission that it was 'contemplating' such an assignment. . . . Even after the assignment became effective on January 1, 1992, SoCalGas failed on its own to advise the Commission of the assignment, despite the claims that '[a]s a business matter, [SoCalGas] always communicate[s] closely with the pertinent staff on these matters whether or not there is a formal requirement that [SoCalGas] . . . submit a filing.' . . . Apparently, . . . the assignment was discovered by accident during the course of the implementation proceedings . . . .

"Thus, from the record, a strong evidentiary inference can be drawn that SoCalGas did not intend to inform the Commission about the assignment of interstate capacity to an affiliate . . . . [¶] Interestingly, SoCalGas also did not address the assignment in its testimony [before the PUC] . . . Absent the Commission's accidental discovery of this illegal assignment, the inaccurate language in the . . . report constituted a continuing misrepresentation of the true facts . . . and would have misled the Commission that the assignment was only being contemplated. [¶] Therefore, by failing to provide the correct information in its report, and in not informing the Commission of the actual assignment, SoCalGas misrepresented and misled the Commission . . . .

"Such a conclusion is supported by [the 1990 decision]. In this decision, the Commission found a Rule 1 violation against a cellular telephone company for taking advantage of a 'mistake' it had introduced and for failing to bring this 'mistake' to the attention of the Commission within a reasonable time." (Cal.P.U.C. Decision 92-07-084 (July 22, 1992) [45 CPUC2d 242], citations omitted.)

The 2001 decision involved the failure to disclose relevant information to the Commission. The PUC refused to accept the utility's claim that this was an innocent oversight:

"There is no dispute that Sprint PCS failed to disclose the information sought by the staff . . . . Sprint PCS' major argument is that the omission was purely unintentional and as such, does not qualify as a Rule 1 violation. . . . [¶] Even to the extent we were to presume that Sprint PCS did not intentionally set out to deceive the staff, the results of its actions did have the effect of misleading the staff." (Cal.P.U.C. Decision 01-08-019 (Aug. 2, 2001) [Slip Opn., pp. 7–8].)

"Merely because a party initially withholds information . . . and then later discloses the information . . . does not necessarily mean that the initial nondisclosure was purely unintentional. The timing or manner in which information is disclosed could potentially have a material effect on the outcome . . . . If a party is able to simply claim ignorance of the initial omission, the party would . . . escape any sanctions or penalties. [¶] In any event, the question of intent to deceive merely goes to the question of how much weight to assign to any penalty that may be assessed. The lack of direct intent to deceive does not necessarily, however, avoid a Rule 1 violation." (Cal.P.U.C. Decision 01-08-019, *supra* [Slip Opn., pp. 7–9].)

In sum, that both the Commission and PG&E can point to seemingly contradictory expressions on the predicate for Rule 1.1 liability is enough to establish that the Commission's expressions on this issue have not been uniform. Put conversely, if the Commission has a fixed position on Rule 1.1 liability, its inconsistent expressions make it difficult to discern. We have said that judicial deference is not given to an administrative interpretation that is inconsistent, transitory, or " ' "vacillating." ' " (*State Building &*

41

*Construction Trades Council of California v. Duncan* (2008) 162 Cal.App.4th 289, 303.) But we went on to state: "Nevertheless, the opinion of an administrative agency as to a statute's meaning may be helpful even if it is 'not binding or necessarily even authoritative.' [Citations.] 'Courts must, in short, independently judge the text of the statute, taking into account and respecting an agency's interpretation of its meaning, of course, whether embodied in a formal rule or less formal representation. Where the meaning and legal effect of a statute is the issue, an agency's interpretation is one among several tools available to the court. Depending on the context, it may be helpful, enlightening, even convincing. It may sometimes be of little worth.' " (*Id.* at p. 304, quoting *Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th 1, 7–8.) And in the 1998 decision we were quoting, our Supreme Court stated: "Whether judicial deference to an agency's interpretation is appropriate and, if so, its extent—the 'weight' it should be given— is thus fundamentally *situational*. A court assessing the value of an interpretation must consider a complex of factors material to the substantive legal issue before it, the particular agency offering the interpretation, and the comparative weight the factors ought in reason to command." (*Yamaha Corp. of America v. State Bd. of Equalization*, *supra*, at p. 12.)

Based on the above, the quantum of deference owed to the PUC's interpretation of Rule 1.1 might be described as minimal. (See *Yamaha Corp. of America v. State Bd. of Equalization*, *supra*, 19 Cal.4th 1, 12–13 ["A court is more likely to defer to an agency's interpretation of its own regulation . . . [if] the agency 'has consistently maintained the interpretation in question, especially if [it] is long-standing' "].) But even so, this does not mean that the Commission's interpretation is be ignored. It still rates consideration and respect. (*Id.* at pp. 7–8; *Clean Energy Fuels Corp. v. Public Utilities Com., supra*, 227 Cal.App.4th 641, 649.) As we have taken pains to establish, we cannot look just to Rule 1.1, we must also account for its statutory ancestry (see fn. 15, *ante*), statutes that are part of the extensive regulatory scheme entrusted to the Commission's administration. And that responsibility requires us to give some weight to the PUC's interpretation of those statutes, if that interpretation bears a reasonable relation to the statutes' language

and purposes. (*Southern California Edison Co. v. Peevey*, *supra*, 31 Cal.4th 781, 796; *Greyhound Lines, Inc. v. Public Utilities Com.*, *supra*, 68 Cal.2d 406, 411; *Pacific Bell Wireless, LLC v. Public Utilities Com.*, *supra*, 140 Cal.App.4th 718, 729 ["we give presumptive value to a public agency's interpretation of a statute within its administrative jurisdiction"].)

So, even if the interpretation of sections 1701 and 2107, together with Rule 1.1, is not a subject to which the PUC brings a technical expertise derived from its regulatory functions, the Commission is nevertheless entitled to its opinion concerning the practical realities. Certainly no court can hope to equal the PUC's knowledge of what will "mislead" it. No court can have an institutional memory of what constitutes "an artifice" gained from familiarity with the practices and procedures before the PUC. This case furnishes a perfect illustration: How can this court presume to think it knows better than the Commission when use of an "Errata" is, or is not, justified and in compliance with the Commission's Rule 1.12(c)? This is a "situational" factor working in favor of the Commission's interpretation of the rule. (See *Yamaha Corp. of America v. State Bd. of Equalization*, *supra*, 19 Cal.4th 1, 12; *Clean Energy Fuels Corp. v. Public Utilities Com.*, *supra*, 227 Cal.App.4th 641, 649.) And the means chosen by the Commission to fulfill its constitutional and statutory authority are to receive a liberal construction (*San Diego Gas & Electric Co. v. Superior Court*, *supra*, 13 Cal.4th 893, 915), which, we believe, reasonably translates as a measure of judicial deference to what the PUC deems appropriate to police its jurisdiction.

True, the PUC's interpretation of Rule 1.1 may have been shrouded in a haze of divergent and even differing formulations. Yet the subject addressed by the rule—ensuring the transmission of truthful information to the Commission—is obviously central to the proper discharge of the PUC's responsibilities. The Commission's history of inexactitude or infelicitously expressing what will be deemed a violation of Rule 1.1 cannot be used to vitiate a vital deterrent. And thus we reject PG&E's subargument two.

That leaves PG&E's speculative subargument five, which rests upon the assumption that the PUC has used Rule 1.1 to penalize "representations made by a party

43

in complete good faith." As previously shown, the factual predicate of that assumption cannot be indulged "without a whole violation of the standards governing our limited scope of review." (See fn. 20, *ante*.) Another erroneous underlying assumption is the unduly narrow view of the Commission's legitimate deterrence powers. The remainder of subargument five will be addressed while analyzing PG&E's contentions that the Commission used an improper concept of what constitutes a continuing violation, and that the aggregate amount of the penalties imposed violates the excessive fine prohibitions of the United States and California constitutions.

We restate our conclusions:

The operative statutory language is the plain language of section 2107. The Legislature knows how to specify how a mental state shall be required for an act or omission to warrant a financial consequence, and its decision not to include such qualifying words as "willfully," or "knowingly" when that statute was enacted indicates that it did not mean to impose a scienter requirement for a violation of "any part or provision of any order, decision, decree, rule, direction, demand, or requirement of the commission." This court must respect that omission, "not rewrite the statute to conform to an assumed intention which does not appear from its language." (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc*. (1998) 17 Cal.4th 553, 573.)

Section 2107 is not a penal statute that is to receive strict construction. It is instead a statute authorizing a monetary civil penalty in the exercise of the state's unquestioned police power that it has constitutionally delegated to the PUC. Just as firmly established is that the regulatory police power encompasses the imposition of deterrent civil penalties to protect the public interest that do not depend upon actual loss.

By itself, the diffuse and meandering construction the Commission has given to Rule 1.1 might deserve only the merest modicum of deference. Yet that construction exists within the context of the Commission operating under the broad license of section 701, and exercising its "comprehensive jurisdiction over questions of public health and safety arising from utility operations." (*San Diego Gas & Electric Co. v. Superior Court*, *supra*, 13 Cal.4th 893, 924.) The means chosen by the Commission to police that

expansive domain, and enforce control of proceedings before it, is unquestionably a matter that bears a reasonable relation to the purposes and language of the statutes under which the PUC operates, and should receive a measure of judicial recognition and consideration, founded upon appreciation of the practical realities of the Commission administering its vast and variegated jurisdiction.

In any event, our purely independent review would bring us to the same conclusion. Without any input from the Commission, and looking solely at the relevant statutory language, we cannot discern an unmistakable legislative desire for a scienter requirement.

For each and all of these reasons, we conclude the Commission did not exceed its jurisdiction or fail to proceed according to law (§ 1757, subd. (a)) when it invoked Rule 1.1 in its present form as the justification and basis for the imposition of civil penalties on PG&E.

### A "Continuing" Violation Does Not Require "Proof Of Continuing Misconduct"

PG&E's second contention, under the heading "The Commission Erred in Holding that Continuing Violations of Rule 1.1 May be Found Without Proof of Continuing Misconduct," proceeds as follows:

"Having found that PG&E's reporting and filing errors constituted a violation of Rule 1.1 despite the lack of any direct proof of intent to mislead, the Commission then held that those violations should be deemed 'continuing' under . . . § 2108, warranting a cumulative penalty of $50,000 per day. . . . In particular, it determined that PG&E's failure to disclose the corrected pipeline information represented a 'continuing violation' from November 16, 2012 (a month after PG&E first discovered the apparent inconsistency in the specifications for Line 147), through July 3, 2013 (when PG&E filed the Errata); and that the filing of the Errata gave rise to another continuing violation from July 2, 2013 through August 30, 2013 (when PG&E filed a verified statement describing the timeline of events in detail). . . . Those holdings reflect a fundamental misconception of the meaning of 'continuing violation.'

45

"A 'continuing violation' occurs, by definition, only when a party has engaged in 'a continuing course of unlawful conduct' over a period of time. *Richards v. CH2M Hill, Inc.*, 26 Cal.4th 798, 823 (2001). This principle, affirmed in scores of cases from the California Supreme Court and others, requires that the party be shown to have engaged in a course of repeated or ongoing misconduct, such that the provision in question is continually violated over a certain period of time. *Id.*; *see also Flowers v. Carville*, 310 F.3d 1118, 1126 (9th Cir. 2002); *Ward v. Caulk*, 650 F.2d 1144, 1147 (9th Cir. 1981); *Birschtein v. New United Motor Mfg., Inc.*, 92 Cal.App.4th 994, 1005 (2001). In other words, for a 'continuing violation' to be found, the party must have 'continually' violated the provision at issue, from an identifiable start date through an identifiable end date.

"The Commission misunderstood, and as a result misapplied, this basic concept. It held that a 'continuing violation' may exist over any period of time that a party, once adjudged to have violated a rule, fails to fully and completely correct the breach. . . . On that basis, it determined that in this case PG&E's failure to correct the inaccurate pipeline information was 'continuing' throughout the period that PG&E might have but did not remedy the error through a formal notification to the Commission. [Citation.]

"That conclusion cannot be reconciled with the cases discussed above, which recognize that a 'continuing violation' is characterized by 'a continuing course of unlawful conduct,' *Richards*, 26 Cal.4th at 823, *not* 'by continual ill effects from the original violation,' *Ward*, 650 F2.d at 1147. Thus, neither 'the lingering effect of an unlawful act' nor 'the mere failure to right a wrong' constitutes a continuing violation. *Earle v. D.C.*, 707 F.3d 299, 306 (D.C. Cir. 2012); *see also Garcia v. Brockway*, 526 F.3d 456, 462 (9th Cir. 2008) (en banc); *Cowell v. Palmer Twp.*, 263 F.3d 286, 293 (3d Cir. 2001). Here, even assuming that the Commission was 'misled' by the inaccurate information concerning the pipeline specification, the violation occurred and was completed at the time the inaccuracy was discovered. While the effect of the violation might arguably have 'linger[ed]'in some sense until PG&E communicated with Commission staff in early 2013 or even until it filed the Errata, PG&E's failure to communicate with the Commission sooner did not 'mislead' the Commission any further

46

than what had already occurred, and could not be deemed a continuing or repeated series of unlawful acts. *See Garcia*, 526 F3d at 462. At most, this course of conduct represented a 'failure to right a wrong'—which, as the cases above state, does not constitute a 'continuing violation.' *Earle*, 707 F.3d at 306; *accord Alston v. Hormel Foods Corp*., 730 N.W.2d 376, 381 (Neb. 2007)."

PG&E's reasoning was quoted at length to demonstrate why it must be rejected.

The decisions cited by PG&E deal with the idea of a "continuing violation" as a judicially created doctrine that will toll the statute of limitations, specifically in anti-discrimination actions. This is shown by the full quotation from the decision of our Supreme Court instanced by PG&E as the definitional exemplar of what constitutes a "continuing violation": "Thus, when an employer engages in a continuing course of unlawful conduct under the FEHA by refusing reasonable accommodation of a disabled employee or engaging in disability harassment, and this course of conduct does not constitute a constructive discharge, the statute of limitations begins to run, not necessarily when the employee first believes that his or her rights may have been violated, but rather, *either* when the course of conduct is brought to an end, as by the employer's cessation of such conduct or by the employee's resignation, *or* when the employee is on notice that further efforts to end the unlawful conduct will be in vain." (*Richards v. CH2M Hill, Inc*., *supra*, 26 Cal.4th 798, 823.)

PG&E again fails to recognize that we are dealing with a statute. And that statute—namely, section 2108, enacted in 1951 with the Public Utilities Code (Stats. 1951, ch. 764, § 2108, p. 2098)— expressly codifies the concept of a continuing violation of "any order, decision, decree, rule, direction, demand, or requirement" of the Commission. Not only that, it specifies that such a violation may continue on a daily basis. Instead of tackling this statutory language, PG&E relies on a common law doctrine that has no connection to administrative law—or the authority of a regulatory agency to impose monetary penalties for persistent noncompliance with its orders.

Section 2108 is no outlier. "[M]any statutes expressly authorize penalties for continuing violations." (*Boorstein v. CBS Interactive, Inc.* (2013) 222 Cal.App.4th 456,

47

470, fn. 3.) Numerous codes have such provisions, specifying that a continuing violation may occur on a daily basis. (See, e.g., Bus. & Prof. Code, § 13610; Corp. Code, § 28900; Fin. Code, §§ 2151.1, 5310, subd. (b)(2), 18349.5, subd. (i)(3), 31900; Gov. Code, § 8670.66, subd. (b), 8670.67, subd. (b); Health & Saf. Code, §§ 17061, subd. (c), 17061.5, subds. (a), (b), (c)(1), (d); Ins. Code, §§ 728, subd. (h)(2), (h)(3), 1748.5, subd. (h)(3); Pub. Resources Code, §§ 14591.1, subds. (b), (c), 42850, subd. (a); Veh. Code, §§ 32053, subd. (a), 34660, subd. (b); Wat. Code, § 6425.) Indeed, section 2108 is not unique in the field of public utilities, being one of four such statutes governing continuing violations in various aspects of the PUC's extensive jurisdiction. (See §§ 1013, subd. (j) [applicable to telephone and telegraph corporations], 5315 [household goods carriers], and 5415 [charter-party passenger carriers].)

Moreover, it is clear from section 2108 and the other penalty-related statutes that the Legislature left it to the Commission to decide what amounts to a violation of "any order, decision, decree, rule, direction, demand, or requirement of the commission." (See § 2101 ["The Commission shall see that . . . statutes . . . affecting public utilities . . . are enforced and obeyed, and that violations thereof are promptly prosecuted and penalties due . . . recovered and collected"].) The statutory scheme clearly accepts that the PUC will be able to identify when a violation amounts to a continuing one. How the Commission does so would clearly be another matter. (See *Southern California Edison Co. v. Peevey*, *supra*, 31 Cal.4th 781, 796; *Greyhound Lines, Inc. v. Public Utilities Com.*, *supra*, 68 Cal.2d 406, 410–411.) As such, it is entitled to considerable deference by a reviewing court.

PG&E's proffered definition of a continuing violation would apply only to instances of positive acts, and not cover a persistent failure to act, such as the Commission found here. If accepted, PG&E's "failure to correct a wrong" approach would eviscerate the Commission's power to require continual self-reporting by virtually destroying the Commission's power to sanction noncompliance. It amounts to another attempt to gut the PUC's vital deterrent power of enforcing compliance with its orders. Instead of treating a violation as occurring daily, as expressly authorized by section 2108,

48

PG&E would truncate that power by rewriting the statute to make the maximum penalty $50,000 (or in this case, $100,000 for the two violations found by the Commission). Indeed, PG&E's definition would constitute such a severe restriction on the PUC's power to enforce compliance with its orders that it would produce another result by rewarding parties who succeed in misleading the Commission by their continued noncompliance but who, as PG&E would have it, "[do] not 'mislead' the Commission any further than [has] already occurred." This is another outlandish outcome we must reject. (*Eel River Disposal & Resource Recovery, Inc. v. County of Humboldt, supra*, 221 Cal.App.4th 209, 227; *Reliable Tree Experts v. Baker, supra*, 200 Cal.App.4th 785, 796–797; *Friends of Bay Meadows v. City of San Mateo, supra*, 157 Cal.App.4th 1175, 1191.) Were all this not enough, we note that had the Legislature intended such a result, it knew how to have employed language to accomplish it. (See Pub. Resources Code, § 4601.1, subds. (a)(1), (b) ["damage that occurs over multiple days that results from a single action shall not be considered a continuing violation"].) Again, it is not our function to remedy that omission. (*Napa Valley Wine Train, Inc. v. Public Utilities Com., supra*, 50 Cal.3d 370, 381.)

Once it is established that PG&E was under a continuing duty to advise the Commission of the information concerning Lines 101 and 147, the Commission could treat PG&E's violation as a continuing one for each of the 229 days that duty remained unsatisfied. And once it is established that PG&E was under a duty to correct the "misleadingly titled and factually incomplete" Errata, the Commission could treat PG&E's violation as a continuing one for each of the 58 days until PG&E finally satisfied that duty.[25] The Commission was obviously following the reasoning noted by

---

[25] We certainly do not agree with PG&E's characterization as "arbitrary" of the dates selected by the Commission to start and end each of the violations. If anything, the Commission may have been generous in fixing November 16, 2012, almost a month after the October 18 discovery of the Line 147 problem, as "the date by which . . . PG&E should have prepared and submitted a filing to inform the Commission of the significant and material discovery of the records discrepancy" with Line 147. If, as PG&E asserts, "this date was apparently plucked from thin air," it nevertheless amounted to giving

49

this court in 2000, that PG&E "had it within [its] control first to prevent and then to stop the accumulation of penalties" (*City and County of San Francisco v. Sainez, supra*, 77 Cal.App.4th 1302, 1316), an approach well-established in the context of a continuing nuisance. (See, e.g., *Baker v. Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal.3d 862, 869 ["if a nuisance is a use which may be discontinued at any time, it is considered continuing"]; *Phillips v. City of Pasadena* (1945) 27 Cal.2d 104, 107 ["if the nuisance may be discontinued at any time it is considered continuing"].) Last, but by no means incidentally, we note that our Supreme Court has on two occasions pointed to section 2107 as allowing penalties to accumulate on a daily basis. (*Hale v. Morgan*, *supra*, 22 Cal.3d 388, 401; *People v. Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 642.)

---

PG&E a month's grace period, something we would not normally think would elicit complaint from the party benefitted. And as to the end date, the penalty stopped with the filing of a "verified statement" by PG&E's Vice-President of Gas Transmission, Maintenance and Construction explaining how the "discrepancies" in Lines 101 and 147 were discovered and how PG&E responded. There is nothing arbitrary about this reasoning.

PG&E maintains the penalty should have halted when "PG&E actually disclosed the corrected information to Commission staff in March 2013," and thus, "at least as of that time, PG&E was neither withholding the information nor 'misleading' the Commission." However, as previously noted, PG&E failed to provide staff with requested documents and information concerning the errors until the end of May 2013. Thus, at best, there was only a partial, or attempted, disclosure. More significantly, as the Commission stated in its decision denying rehearing and rejecting this very argument: "The Commission has consistently rejected utility efforts to rely on communications with staff [in] satisfying their obligation to *formally* inform the Commission *and parties* in the applicable proceeding. [Footnote.] For that reason, the [initial] Decision reminded PG&E that conversations with staff do not substitute for such notification." (Italics added.) In its initial decision the PUC stated: "Rule 1.1 does not treat the Commission and its staff as synonymous." It should be obvious why the Commission would not wish to encourage parties to believe that an informal discussion, in this case a conference call with a single staff member, would substitute for the formal written amendment the Commission took such pains to identify as the proper means to inform the Commission, and the dozens of interested parties who would also be notified of the amendment.

50

## PG&E Received Constitutionally Adequate
## Notice of the Potential Fines

The first of PG&E's two constitutional claims proceeds as follows: "Due process requires, at its most basic, that a party be given fair notice of allegations of misconduct prior to any adjudicatory hearing. . . . [¶] That essential requirement was flouted here. The Show Cause Order in this matter gave notice of two specific alleged violations of Rule 1.1: (i) whether PG&E attempted to mislead the Commission by titling its disclosure filing as an 'Errata' and (ii) whether PG&E attempted to mislead the Commission by filing on July 3, 2013, 'the day before a summer holiday weekend.' [Citation.] Nothing in the Order indicated that the Commission would also consider whether PG&E had separately violated Rule 1.1 by failing to disclose the corrected pipeline specification information a month after the first preliminary information was discovered, or that PG&E might face continuing violation sanctions based on any breach of disclosure or filing obligations." This portrayal of PG&E as the victim of bureaucratic bushwhacking is unsound.

In conducting an adjudicatory hearing, the PUC is not governed by the Administrative Procedure Act (Gov. Code, § 11340 et seq.), but is allowed to establish its own procedures (§§ 1701, 1701.2), subject, of course, to the constitutional obligation to satisfy due process, as to which Justice Robert Jackson stated the classic formulation: "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." (*Mullane v. Central Hanover Tr. Co*. (1950) 339 U.S. 306, 314.) Four years later, our Supreme Court ruled on the application of this principle to the PUC: "Due process as to the commission's . . . action is provided by the requirement of adequate notice to a party affected and an opportunity to be heard before a valid order can be made." (*People v. Western Air Lines, Inc*., *supra*, 42 Cal.2d 621, 632.)

The centrality of notice is indisputable. "Engrained in our concept of due process is the requirement of notice. Notice is sometimes essential so that the citizen has the

51

chance to defend charges.  Notice is required before property interests are disturbed, before assessments are made, before penalties are assessed." (*Lambert v. California* (1957) 355 U.S. 225, 228.)  But satisfying the obligation of due process does not have to be onerous.

To begin with, due process does not require any particular form of notice. (*Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 990; *Drummey v. State Bd. of Funeral Directors* (1939) 13 Cal.2d 75, 80; see *Litchfield v. County of Marin* (1955) 130 Cal.App.2d 806, 813 ["there is no constitutional mandate . . . which makes specific how . . . notice is to be given or which form it must take"].)  The details can be flexible, "depend[ing] on the circumstances . . . var[ying] with the subject matter and the necessities of the situation." (*Sokol v. Public Utilities Commission* (1966) 65 Cal.2d 247, 254; see *Haas v. County of San Bernardino* (2002) 27 Cal.4th 1017, 1037 ["The requirements of due process are flexible, especially where administrative procedure is concerned"].)  All that is required is that the notice be reasonable. (*Jonathan Neil & Assoc., Inc. v. Jones* (2004) 33 Cal.4th 917, 936, fn. 7; *Drummey v. State Bd. of Funeral Directors*, *supra*, at pp. 80–81.)

As PG&E sees it, the Commission's OSC alerted PG&E only to the distinctly minor offenses of choosing the wrong title for the document it submitted, and making that submission on the eve of a major summer holiday.  This characterization is inaccurate.  The OSC told PG&E that its attempted filing of the Errata "raises procedural and substantive issues," which the Commission called "serious issues."  The OSC notified PG&E that the Errata was procedurally improper because it went beyond "correcting minor typographical or computational errors" and "could be interpreted as attempting to create an inaccurate impression of a routine correction."  The OSC also notified PG&E that the Errata was perceived by the Commission as "making substantive changes to a previously filed application" by "revealing a substantial error in an application upon which the Commission has relied in issuing a decision."  In sum, a fair reading of the OSC discloses that the PUC was not merely concerned with how the filing was titled.

What did attract the Commission's attention was the substance of the document. The Commission's language—referring to "substantive issues," "substantive changes to a previously filed application," and "revealing a substantial error in an application upon which the Commission has relied in issuing a decision"—goes far beyond the single word chosen for a caption. The Commission was obviously paying close attention to the contents of PG&E's document. And the wording of the OSC leaves no room for doubt on this point: "Attempting to correct an application eighteen months after the Commission issued a decision appears to be an unreasonable procedural choice and could be interpreted as attempting to create an inaccurate impression of a routine correction. The timing of the attempted filing, the day before a summer holiday weekend, also raises questions. [¶] Substantively, as the record shows in this proceeding and others, the accuracy of PG&E's natural gas transmission pipeline records has been and remains an extraordinarily controversial issue in which the public has an intense interest. The facts stated in PG&E's July filing appear to directly implicate this issue, particularly the continuing inaccuracy of PG&E's records and the happenstance means by which this most recent instance of erroneous records was discovered. Submitting this provocative information in a routine-appearing document could be seen as an attempt to mislead the Commission and the public on the significance of this new information." As for the timing of the Errata, that merited only the single sentence just quoted.

The OSC advised PG&E that it may have violated Rule 1.1, thus exposing it to the financial consequences specified in section 2107. It is true that the OSC did not cite section 2108, or tell PG&E that "each offense, if found to be supported by evidence at the hearing," might be treated as a continuing offense.[26] But section 2108 does not define a substantive offense, but merely states how such an offense may be "a separate and distinct offense, and . . . a continuing violation." PG&E cites to no authority that due

_____

[26] We cannot claim to have made a systematic study, but it is our impression that the PUC does not makes it a practice to cite section 2108 in OSC's for matters that are subsequently penalized as continuing violations. Given the minimal effort this would entail, the PUC might wish to revise this practice.

process demands that the full and complete possible adverse consequences be spelled out in the notice. The OSC did advise PG&E that it was accused of violating Rule 1.l, and that appears to be the most consequential detail.[27] (Cf. *Margarito v. State Athletic Com.* (2010) 189 Cal.App.4th 159, 171 ["the Commission's letter informed Margarito of the specific violation of which he was accused—hand wraps that violated rule 323"].) And the Commission makes a cogent point in its answer to PG&E's petition: "[I]t is neither surprising nor improper that the OSC could not identify the ultimate timing issue . . . . The Errata that triggered the OSC did not disclose that PG&E had discovered new information months before it notified the Commission. *That fact was not revealed until PG&E was told to provide a complete explanation of the events*"—which did not occur until PG&E filed the "Verified Statement" 11 days after the OSC issued.

Moreover, our inquiry does not have to end with the OSC. As already recounted, the briefs filed by SED and TURN prior to the Commission's initial decision show that those entities construed the OSC as putting PG&E on notice as to whether it had failed to comply with a standing order that the Commission be promptly notified of matters relating to pipeline safety, and whether PG&E's delay in complying with that directive constituted a continuing violation within the plain scope of section 2108. So did each of the proposed decisions submitted by Commissioner Ferron and the ALJ. Following the Commission's initial decision, PG&E identified the supposed lack of notice as one of the grounds for which it sought a rehearing. The point was contested by TURN, the SED, and the cities of San Bruno and San Carlos in the written opposition to PG&E's request. The Commission held a hearing on PG&E's request, at which it heard PG&E's Chairman

---

[27] When it denied PG&E's request for rehearing, the PUC took the position that "penalties are considered in the context of the entire statutory scheme governing 'Violations' under the Public Utilities Code ['specifically Pub. Util. Code, §§ 2100–2119']. Section 2108, involving continuing violations, is part of that statutory scheme." Given that PG&E was being advised by experienced counsel (see text accompanying fn. 10, *ante*), it is difficult to credit that the concept of a continuing violation was unknown or could not reasonably be anticipated at being at issue. Put another way, we think it exceedingly unlikely that PG&E believed it was facing a penalty of no more than $100,000.

and Chief Executive Officer and its Vice-President of Gas Transmission, Maintenance and Construction earnestly assert PG&E's good faith and complete lack of intent to mislead the commission.

Administrative proceedings " 'are not bound by strict rules of pleading . . . . So long as the respondent is informed of the substance of the charge and afforded the basic, appropriate elements of procedural due process, he cannot complain of a variance between administrative pleadings and proof.' " (*Smith v. State Bd. of Pharmacy* (1995) 37 Cal.App.4th 229, 241, quoting *Stearns v. Fair Employment Practice Com.* (1971) 6 Cal.3d 205, 213.) In other words, " '[a] variance between the allegations of a pleading and the proof will not be deemed material unless it has *actually misled* the adverse party to his prejudice in maintaining his action or defense on the merits, and a variance may be disregarded when the action has been as fully and fairly tried on the merits as though the variance had not existed.' [Citations.]" (*Cooper v. Board of Medical Examiners* (1975) 49 Cal.App.3d 931, 942, italics added.)

The situation here is not a true variance situation because there is no real divergence between pleading and proof, but at most a divergence between how the OSC can be read. No one was obliged to take PG&E's word that the notice provided by the OSC was inadequate. Certainly the PUC did not, nor did the real parties in interest. And when PG&E sought rehearing, it did not claim that its ability to present a defense had been compromised. It made nothing akin to an offer of proof, identifying no testimony or other evidence it would have presented had it realized the full scope of what the OSC entailed. Nor does PG&E attempt to do so in its petition. With due regard for the totality of these circumstances, we conclude that any imprecision in the OSC did not prejudice PG&E in presenting its defense. (*Stearns v. Fair Employment Practice Com.*, *supra*, 6 Cal.3d 205, 213; *Cooper v. Board of Medical Examiners*, *supra*, 49 Cal.App.3d 931, 942; *Yanke v. State Dep't of Public Health* (1958) 162 Cal.App.2d 600, 603.)[28]

---

[28] Citing *FCC v. Fox TV Stations, Inc.* (2012) ---U.S. --- [132 S.Ct. 2307], PG&E argues that the OSC was "so broad and so vaguely worded that it did not . . . in any meaningful way limit the scope of allegations against which PG&E must defend, or

## The Fines Are Not Constitutionally Excessive

PG&E's final contention is based on the application of the excessive fine prohibitions of the United States and California constitutions (quoted at fn. 14, *ante*) to civil penalties imposed by an administrative agency. (See *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 727–729; *Ojavan Investors, Inc. v. California Coastal Com.* (1997) 54 Cal.App.4th 373, 396–397.)

In December 1998, the PUC promulgated detailed guidelines for the process of calculating fines. (See *Enforcement Rules*, *supra*, 84 Cal.P.U.C.2d 167, 188–190.) "[T]he two general factors used by the Commission in setting fines are: (1) severity of the offense and (2) conduct of the utility." (*Id*. at p. 188.) The "conduct of the utility" includes its actions to "Prevent a Violation," "Detect a Violation," and "Disclose and Rectify a Violation." (*Id*. at p. 189.) The Commission will also consider the "Financial Resources of the Utility" and the "Totality of the Circumstances in Furtherance of the Public Interest." (*Ibid*.) "In all cases, the harm will be evaluated from the perspective of the public interest." (*Ibid*.)

---

restrict the Commission's ability to *sua sponte* expand the investigation to address new issues . . . without any prior notice to PG&E." Also citing *FCC v. Fox*, amici appear to invoke the void-for-vagueness doctrine and apply it to Rule 1.1 in light of the Commission's "inconsistency" regarding whether scienter is required. We doubt whether either PG&E or amici genuinely mean to assert that Rule 1.1 is truly void on its face, and thus incapable of any constitutionally valid application in its current form. (See *FCC v. Fox TV Stations, Inc.* (2012) ---U.S. --- [132 S.Ct. 2307, 2316 [notice component of due process "requires the invalidation of laws that are impermissibly vague"]; *People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1116 ["a claim that a law is unconstitutionally vague can succeed *only* where the litigant demonstrates . . . that the law is . . . 'impermissibly vague in *all of its applications*."].) Regardless, the issue is not properly before us. In reviewing a PUC decision on a writ of review, "the petitioner may not raise in court a matter not included in its application for rehearing" to the PUC of its decision. (*Utility Consumers' Action Network v. Public Utilities Com.* (2010) 187 Cal.App.4th 688, 696.) The word 'vagueness" was not mentioned in PG&E's application for rehearing. And we will not let amici argue what PG&E cannot. (*California Assn. for Safety Education v. Brown* (1994) 30 Cal.App.4th 1264, 1275.)

In the only decision by our Supreme Court on this point, it appears to have adopted the approach of the United States Supreme Court that " '[t]he touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality,' " including these factors: "(1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay." (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, *supra*, 37 Cal.4th 707, 728 [citing and quoting *United States v. Bajakajian* (1998) 524 U.S. 321, 334, 337–338], 720–721.)

We have encountered a number of decisions where the PUC systematically discussed various of these factors in calculating fines. (E.g., Cal.P.U.C. Decision 13-09-028 (Sept. 19, 2009); Cal.P.U.C. Decision 08-09-038 (Sept. 18, 2008); Cal.P.U.C. Decision 04-04-065 (April 22, 2004); Cal.P.U.C. Decision 01-08-019, *supra*; Cal.P.U.C. Decision 95-04-43, *supra*.) The Commission did not follow that process here, but PG&E does not contend that this omission makes the fine order invalid.[29]

Adverting generally to these considerations, PG&E's argument runs as follows: "[The Excessive Fines] Clauses prohibit fines that are 'grossly disportiona[te]' to the underlying violation. *United States v. Bajakajian*, [(1998)] 524 U.S. 321, 324 . . . . Whether a fine is 'grossly disproportional' is determined by (i) the extent of the harm caused, (ii) the gravity of the offense relative to the fine, (iii) the relationship of the violation to other illegal activity, and (iv) the availability of other penalties and the maximum penalties that could have been imposed. [Citation]; *People v. R.J. Reynolds Tobacco Co.*, 37 Cal.4th 707, 728 (2005) . . . . Of perhaps greater importance, however, is the disparity between the fine and any actual damages resulting from the underlying offense: where the amount of the fine is many multiples greater than actual damages, the penalty is more likely unconstitutional. [¶] The fines imposed by the Commission in this case . . . are the largest ever imposed by the Commission for such a violation of Rule 1.1,

---

[29] We mention this because such an explication of the Commission's reasoning would considerably assist subsequent judicial review.

and yet *none* of the factors relevant to the 'grossly disproportionate' analysis supports such a massive penalty.

"*First*, the adjudicated violations did not cause any harm and did not pose any risk to the Commission, its staff, any party, or the public. [Citation.] The Commission can point only to a generalized 'potential for harm,' that cannot by itself support such an excessive fine, especially where, as here, the potential risk never materialized . . . .

"*Second*, although 'misleading' a regulatory body is certainly a serious matter in general, in this case PG&E did not act with any intent to deceive, or indeed with any culpable intent whatsoever. . . .

"*Third*, the violations here did not contribute to or result from any other illegal activity. To the contrary, the pipeline information was discovered while PG&E was performing safety-related inspections—conduct undeniably intended to advance public safety. [Citation.]

"Finally, the fines in this case represented not merely the maximum allowed under state law, but in fact were *greater* than that permitted by statute because of the Commission's erroneous interpretation of what constitutes a 'continuing violation.' [Citation.] Particularly given the vast disparity between the damages caused by the violations (at most, the costs associated with additional Commission proceedings) and the nearly $15 million fines, those fines cannot be reconciled as consonant with the Excessive Fines Clauses of either the California or Federal Constitution[s]."

Much of this is familiar. PG&E's argument that "the adjudicated violations did not cause any harm and did not pose any risk to the Commission, its staff, any party, or the public" is literally true, but it completely misperceives what was at issue. "No harm no foul" may work in the schoolyard, but it is no principle for the maintenance of public safety. Given the context here, PG&E's emphasis on "actual damages" is dismaying, antithetical to the entire concept of deterrence. The Commission takes a very dim view of denying it information, treating it as a factor in aggravation when its comes to fixing penalty. (See Cal.P.U.C. Decision 13-09-028, *supra* [Slip Opn., p. 36] ["The withholding of relevant information causes substantial harm to the regulatory process, which cannot

58

function effectively unless participants act with integrity at all times. . . . [T]his criterion weighs in favor of a significant fine."].)

We have already determined that virtually denuding the Commission's jurisdiction would be a consequence of the way PG&E wants to have Rule 1.1, as well as sections 2107 and 2108, interpreted. The notion that a civil penalty cannot be imposed if "the potential risk never materialized" would encourage utilities not to self-report, and, by stripping the Commission's sanction power, would make a Commission order to self-report essentially meaningless—indeed, reward defiance of the Commission. PG&E will not prevail in its attempt to repackage in constitutional wrapping the same intent-based arguments we have already rejected.

PG&E's last argument (the "*Third*" one quoted above) is phrased in a manner the PUC could regard as a masterpiece of tendentious wording. The "safety-related inspection" PG&E casts in such a favorable light was exactly the type of event, i.e., a gas leak, that the Commission could view as covered by PG&E's self-reporting obligation. Moreover, the fact that PG&E neglected that obligation for nine months—and then only imperfectly attempted to correct—was one the Commission viewed as "profoundly disheartening," precisely because "[n]atural gas transmission system safety *by this operator* has been one of the Commission's highest priorities for three years." (Italics added.) The Commission was understandably dismayed at learning that Line 147 could have been operated in an unsafe manner, and yet within the authorized MAOP, because the Commission made that authorization on the basis of inaccurate information furnished by PG&E. That dismay was only aggravated by being advised of "this provocative information in a routine-appearing document."

According to the Commission's Enforcement Rules—which, not incidentally, are never mentioned by PG&E—PG&E was on notice that a violation of Rule 1.1 that did not cause actual physical harm to people or property would be treated almost as severely as one that did. (See *Enforcement Rules*, *supra*, 84 Cal.P.U.C.2d 167, 188.) The PUC here was confronting a violation of its order—a violation that, beyond disputing the mental state issue, PG&E makes no real attempt to deny—concerning the safe operating

59

pressure of a pipeline transmitting gas through heavily inhabited urban areas. PG&E argued that the violation was inadvertent. The Commission found that explanation, delivered through Lead Counsel, lacked credibility. That determination, together with its decision to impose penalties, evidence the Commission's conclusion that PG&E had not acted in good faith.

At the end of this proceeding, PG&E's Chief Executive Earley told the Commission: "The fact that I'm here today means that we failed to meet your expectations in how we communicated with you." In the exercise of its "comprehensive jurisdiction over questions of public health and safety arising from utility operations" (*San Diego Gas & Electric Co. v. Superior Court*, *supra*, 13 Cal.4th 893, 915, 924), the Commission determined that that failure was sufficiently egregious to warrant a sanction of $14,350,000. That determination comes to us with a strong presumption of correctness, a presumption that extends to all factual determinations, and to the Commission's construction of sections 2107 and 2108, and Rule 1.1, all of which deal with the conduct of regulatory practices and practicalities concerning which the Commission is more familiar and more expert.[30] Although the amount is large, so is the real and potential harm caused by PG&E's inaction. And PG&E does not argue that it lacks the ability to pay the fine. (*Id*.; § 2104.5; see Cal.P.U.C. Decision 11-11-001 (Nov. 1, 2011) [Slip. Opn. p. 40] ["PG&E reported 2010 operating revenues of $13.841 billion."].)

Exercising our independent judgment as specified by section 1760, the penalties imposed do not strike us as "*grossly* disproportional to the gravity" of PG&E's tardiness

---

[30] "Effective deterrence also requires that the Commission recognize the financial resources of the public utility in setting a fine which balances the need for deterrence with the constitutional limitations on excessive fines. . . . The Commission intends to adjust fine levels to achieve the objective of deterrence, without becoming excessive, based on each utility's financial resources." (*Enforcement Rules*, *supra*, 84 Cal.P.U.C.2d 167, 189.) "[T]he two general factors used by the Commission in setting fines are: (1) severity of the offense and (2) conduct of the utility. These help guide the Commission in setting fines which are proportionate to the violation." (*Id*. at p. 188.)

in self-reporting information that the Commission and the public were entitled to know. (*United States v. Bajakajian*, *supra*, 524 U.S. 321, 324, italics added.) "We cannot conclude that the unconstitutionality of the penalty [imposed by the PUC] clearly, positively and unmistakably appears." (*City and County of San Francisco v. Sainez*, *supra*, 77 Cal.App.4th 1302, 1321.) PG&E has failed to demonstrate a violation of the Excessive Fine provisions of either the United States or the California Constitutions.

## DISPOSITION

Decisions 13-12-053 and 14-05-034 are affirmed.

 

                       _____

                       Richman, J.

We concur:

_____

Kline, P.J.

_____

Miller, J.

A142127, *Pacific Gas and Electric v. Public Utilities Commission*

Pacific Gas and Electric Company v. Public Utilities Commission of California (A142127P)

Attorneys:

Sidley Austin LLP:  Marie L. Fiala, Carter Phillips, and Quin M. Sorenson
Attorneys for Petitioner

Karen Valentia Clopton and Pamela Nataloni
Attorneys for Respondent

Meyers, Nave, Riback, Silver & Wilson:  Steven Robert Meyers and Harry W. Chamberlain II
Attorneys for Real Party in Interest, City of San Bruno

Thomas John Long
Attorney for Real Party in Interest, The Utility Reform Network

Jones Day:  Charles Churchill Read and Haley Melisse McIntosh
Attorneys for Real Parties in Interest, American Gas Association et al.